146 F.3d 1118
 46 ERC 1865, 28 Envtl. L. Rep. 21,368,
98 Cal. Daily Op. Serv. 4866,
98 Daily Journal D.A.R. 6872
 NATURAL RESOURCES DEFENSE COUNCIL; Trout Unlimited of
California; Bay Institute of San Francisco; California
Natural Resources Federation; California Sportfishing
Protection Alliance; California Trout; Friends of the
River; Northern California Guides Association; Pacific
Coast Federation of Fishermen's Associations; San Joaquin
Raptor Rescue Center; Sierra Club; Stanislaus Audubon
Society, Inc.; United Anglers of California; California
Striped Bass Association; National Audubon Society,
Plaintiffs-Appellees,
v.
David G. HOUSTON, Defendant,
and
Lower Tule River Irrigation District; Porterville
Irrigation District; Saucelito Irrigation District; Stone
Corral Irrigation District; Teapot Dome Water District,
Defendants-Intervenors-Appellants.
NATURAL RESOURCES DEFENSE COUNCIL; Trout Unlimited of
California; Bay Institute of San Francisco; California
Natural Resources Federation; California Sportfishing
Protection Alliance; California Trout; Friends of the
River; Northern California Guides Association; Pacific
Coast Federation of Fishermen's Associations; San Joaquin
Raptor Rescue Center; Sierra Club; Stanislaus Audubon
Society, Inc.; United Anglers of California; California
Striped Bass Association; National Audubon Society,
Plaintiffs-Appellees,
v.
David G. HOUSTON, Defendant,
and
Orange Cove Irrigation District; Delano-Earlimart
Irrigation District; Exeter Irrigation District; Ivanhoe
Irrigation District; Lindmore Irrigation District;
Lindsay-Strathmore Irrigation District; Terra Bella
Irrigation District, Defendants-Intervenors-Appellants.
NATURAL RESOURCES DEFENSE COUNCIL; Trout Unlimited of
California; Bay Institute of San Francisco; California
Natural Resources Federation; California Sportfishing
Protection Alliance; California Trout; Friends of the
River; Northern California Guides Association; Pacific
Coast Federation of Fishermen's Associations; San Joaquin
Raptor Rescue Center; Sierra Club; Stanislaus Audubon
Society, Inc.; United Anglers of California; California
Striped Bass Association; National Audubon Society,
Plaintiffs-Appellees,
v.
David G. HOUSTON, Defendant,
and
Friant Water Users Authority, Defendant-Appellant.
NATURAL RESOURCES DEFENSE COUNCIL; Trout Unlimited of
California; Bay Institute of San Francisco; California
Natural Resources Federation; California Sportfishing
Protection Alliance; California Trout; Friends of the
River; Northern California Guides Association; Pacific
Coast Federation of Fishermen's Associations; San Joaquin
Raptor Rescue Center; Sierra Club; Stanislaus Audubon
Society, Inc.; United Anglers of California; California
Striped Bass Association; National Audubon Society,
Plaintiffs-Appellees,
v.
David G. HOUSTON, Defendant,
and
Madera Irrigation District; Chowchilla Water District,
Defendants-Intervenors- Appellants.
NATURAL RESOURCES DEFENSE COUNCIL; Trout Unlimited of
California; Bay Institute of San Francisco; California
Natural Resources Federation; California Sportfishing
Protection Alliance; California Trout; Friends of the
River; Northern California Guides Association; Pacific
Coast Federation of Fishermen's Associations; San Joaquin
Raptor Rescue Center; Sierra Club; Stanislaus Audubon
Society, Inc.; United Anglers of California; California
Striped Bass Association; National Audubon Society,
Plaintiffs-Appellees,
v.
David G. HOUSTON, Defendant,
and
Arvin-Edison Water Storage District; Shafter-Wasco
Irrigation District; Southern San Joaquin
Municipal Utility District,
Defendants-intervenors- Appellants.
NATURAL RESOURCES DEFENSE COUNCIL; Trout Unlimited of
California; Bay Institute of San Francisco; California
Natural Resources Federation; California Sportfishing
Protection Alliance; California Trout; Friends of the
River; Northern California Guides Association; Pacific
Coast Federation of Fishermen's Associations; San Joaquin
Raptor Rescue Center; Sierra Club; Stanislaus Audubon
Society, Inc.; United Anglers of California; California
Striped Bass Association; National Audubon Society,
Plaintiffs-Appellees,
v.
David G. HOUSTON, Defendant,
and
Tulare Irrigation District, Defendant-Intervenor-Appellant.
NATURAL RESOURCES DEFENSE COUNCIL; Trout Unlimited of
California; Bay Institute of San Francisco; California
Natural Resources Federation; California Sportfishing
Protection Alliance; California Trout; Friends of the
River; Northern California Guides Association; Pacific
Coast Federation of Fishermen's Associations; San Joaquin
Raptor Rescue Center; Sierra Club; Stanislaus Audubon
Society, Inc.; United Anglers of California; California
Striped Bass Association; National Audubon Society,
Plaintiffs-Appellants,
v.
Roger PATTERSON, as Regional Director of the U.S. Bureau of
Reclamation; Bruce Babbitt; Friant Water Users
Authority, Defendants-Appellees,
and
Lower Tule River Irrigation District; Porterville
Irrigation District; Saucelito Irrigation District; Stone
Corral Irrigation District; Teapot Dome Water District,
Defendants-Intervenors- Appellees.
 Nos. 97-16030, 97-16041, 97-16042 to 97-16045 and 97-16173.
 United States Court of Appeals,
Ninth Circuit.
 Argued Dec. 8, 1997.
Decided June 24, 1998.
 
 Gregory K. Wilkinson, Best, Best & Krieger, LLP, Riverside, California, for defendant-appellant and appellee Friant Water Users Authority, and for defendants-intervenors-appellants Lindmore Irrigation District, Lindsay-Strathmore Irrigation District, Terra Bella Irrigation District, Exeter Irrigation District, Ivanhoe Irrigation District, Tulare Irrigation District, Lower Tule River Irrigation District, Saucelito Irrigation District, Delano-Earlimart Irrigation District, Teapot Dome Water District, Arvin-Edison Water Storage District, Southern San Joaquin Municipal Utility District, Shafter-Wasco Irrigation District, Porterville Irrigation District and Stone Corral Irrigation District.
 Philip F. Atkins-Pattenson (argued), Sheppard, Mullin, Richter & Hampton, LLP, San Francisco, California, Hamilton Candee, Elizabeth R. Pulling, Natural Resource Defense Council, San Francisco, California, Patrick O'Donnell, Levy, Samrick & O'Donnell, San Francisco, California, Cynthia L. Koehler, San Francisco, California, Michael R. Sherwood (on the brief), San Francisco, CA, for plaintiffs-appellees and cross-appellants.
 Michael Victor Sexton, Minasian, Spruance, Baber, Meith, Soares & Sexton, LLP, Oroville, California, for defendant-intervenor-appellant Orange Cove Irrigation District.
 Denslow Green, Madera, California, for defendants-appellants Chowchilla Water District and Madera Irrigation District.
 Lois J. Schiffer, Assistant Attorney General, Robert L. Klarquist, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for defendants-appellees Roger Patterson and Bruce Babbitt.
 Daniel E. Lungren, Attorney General of California, Clifford T. Lee and Linus Masouredis, Deputy Attorneys General, San Francisco, California, for amici curiae State of California and California State Water Resources Control Board.
 Appeals from the United States District Court for the Eastern District of California; Lawrence K. Karlton, District Judge, Presiding. D.C. No. CV 88-1658 LKK.
 Before: SKOPIL, D.W. NELSON, and TASHIMA, Circuit Judges.
 TASHIMA, Circuit Judge:
 
 
 1
 Various irrigation and water districts (Non-federal Defendants), that rely on water from the Friant dam, appeal the district court's summary judgment decision that the Bureau of Reclamation (Bureau or Federal Defendant), violated the Endangered Species Act (ESA) by renewing water contracts prior to completing required endangered species consultations. These defendants also appeal the district court's conclusion that Section 8 of the Reclamation Act, 43 U.S.C. § 383, mandates compliance with Section 5937 of the California Fish and Game Code. Various environmental groups led by the National Resources Defense Council (Plaintiffs), cross-appeal the district court's summary judgment decision that the Bureau was not required to comply with National Environmental Policy Act (NEPA) and appeal the dismissal of the Section 8/Section 5937 claim as unripe.
 
 
 2
 We affirm the district court's holding that the ESA was violated and its decision to rescind the contracts at issue. We remand for a determination on the Section 8/Section 5937 claim.
 
 BACKGROUND
 
 3
 The Central Valley Project (CVP) is a multi-unit reclamation project administered by the Bureau. The Friant dam unit of the CVP was built on the San Joaquin River by the Bureau in the 1940s. Prior to construction of the dam, the San Joaquin River met the Sacramento River at the Sacramento-San Joaquin Delta, where they then flowed out to the Pacific Ocean. Since the time that the dam was completed, the Friant unit has impounded the San Joaquin River water behind the Friant dam and diverted the water to surrounding irrigation districts. This impoundment and diversion leaves a dry stretch of San Joaquin riverbed.
 
 
 4
 In the late 1940s, the Non-federal Defendants[1] entered into 40-year Friant water service contracts with the government, pursuant to Section 9(e) of the Reclamation Act of 1939, 43 U.S.C. § 485h(e). The contracts typically provided that they would be renewed no later than one year prior to expiration on terms that "shall be agreed upon." In 1956, Congress mandated that contract holders had a right to renewal "under stated terms and conditions mutually agreeable to the parties." 43 U.S.C. § 485h-1(1). Contract holders had "a first right ... to a stated share or quantity of the project's available water supply...." 43 U.S.C. § 485h-1(4).
 
 
 5
 The first of these contracts, the contract with the Orange Cove Irrigation District (Orange Cove), expired in February of 1989. The Bureau began contract renewal negotiations with Orange Cove in June, 1988, and executed a renewal contract in May, 1989. By 1992, the Bureau had executed 13 additional water contracts. All 14 contracts provided for water delivery for a 40-year period under terms substantially similar to those in the previous contracts.
 
 
 6
 In 1992, Congress enacted the Central Valley Project Improvement Act (CVPIA), Pub.L. No. 102-575, § 3401 et seq., 1992 U.S.C.C.A.N. (106 Stat.) 4600, 4706, which required the government to perform an environmental impact statement (EIS) on the Friant unit before it could execute the remaining renewal contracts. The CVPIA also limited the length of subsequently renewed contracts to 25 years. Therefore, of the 28 Friant water service contracts that were up for renewal, only the first 14 contracts are at issue.
 
 
 7
 Prior to construction of the Friant dam, the San Joaquin River supported a variety of fish species, including the chinook salmon. The annual spring floods also fed the surrounding wetlands with fresh water. After the Friant dam was built, the San Joaquin River terminated at the dam, and water from the Sacramento-San Joaquin Delta is exported upstream to water users below the dam through a process of pumping and reverse flows. This situation has adversely affected both wetlands and river fish, including the winter-run chinook salmon. The salmon, which was listed as threatened in August, 1989, and is now endangered, is under the protective jurisdiction of the National Marine Fisheries Service (NMFS). Other listed species under the jurisdiction of the Fish and Wildlife Service (FWS) are also located in the Friant Service Area.
 
 
 8
 The Plaintiffs filed this action against the Bureau in December, 1988, claiming that the Bureau violated NEPA by renewing the water contracts without first performing an EIS. The Plaintiffs sought a preliminary injunction against further contracts. The district court denied the injunction, but ordered the parties to include in the remaining contracts a clause that conditioned the terms on the final outcome of this case. All the renewal contracts in this case, except for the Orange Cove contract, contain this provision. The contracts also include a clause, entitled "Compliance with Reclamation Laws," which permits minor modifications to the contracts in order to comply with federal law. This clause is known as Article 14.
 
 
 9
 The Plaintiffs' amended complaint also alleges violations of the ESA, section 8 of the Reclamation Act (§ 8), and section 5937 of the California Fish & Game Code (§ 5937). The Non-federal Defendants were permitted to intervene in 1989.
 
 
 10
 There are five district court orders that are now at issue:
 
 
 11
 (1) Order filed April 30, 1992. The district court denied the Defendants' motion to dismiss the § 8/s 5937 claim. See 791 F.Supp. 1425 (E.D.Cal.1992).
 
 
 12
 (2) Order filed October 12, 1993. The district court denied the Defendants' motion to dismiss the § 8/s 5937 claim as mooted or preempted by the CVPIA.
 
 
 13
 (3) Order filed May 31, 1995. The district court granted the Defendants summary judgment on the NEPA claim, but granted the Plaintiffs summary judgment on the ESA claim.
 
 
 14
 (4) Order filed January 16, 1997. The district court ordered the 14 contracts rescinded. The court concluded that the § 8/s 5937 claim was not ripe.
 
 
 15
 (5) Order filed April 16, 1997. The district court amended the January 16, 1997, judgment and dismissed the Plaintiffs' substantive ESA claim without prejudice.
 
 
 16
 The Non-federal Defendants argue that: (1) the ESA did not apply to their contracts; (2) but if it did, the ESA was not violated; (3) but if the ESA was violated, the claim is moot; (4) but if there was an ESA violation that was not mooted, the remedy of contract invalidation was inappropriate. The Non-federal Defendants also argue that the CVPIA preempts § 5937. The Plaintiffs cross-appeal the grant of summary judgment to the Defendants on the NEPA claim and they appeal the court's conclusion that the § 8/ § 5937 claim was not ripe. The Bureau is participating in the Plaintiffs' cross-appeal only.[2]DISCUSSION
 
 I. Endangered Species Act
 A. Overview
 
 17
 Section 7(a)(2) of the ESA requires all federal agencies "to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence" of any endangered or threatened species or result in the destruction of critical habitats. 16 U.S.C. § 1536(a)(2). If an agency determines that its proposed action "may affect" an endangered or threatened species, the agency must formally consult with the relevant Service, the FWS and/or the NMFS, depending on the species that are protected in the area of the proposed action. See Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1054 n. 8 (9th Cir.1994). After the formal consultation is completed, the relevant Service will issue a Biological Opinion evaluating the nature and extent of effect on the threatened or endangered species. If the Biological Opinion concludes that the proposed action is likely to jeopardize a protected species, the agency must modify its proposal. Section 7(d) of the ESA prohibits the "irreversible or irretrievable commitment of resources" during the consultation process. 16 U.S.C. § 1536(d).
 
 
 18
 As the district court observed, the ESA has "explicit substantive goal[s] which [are] served by its procedural requirements." Order of May 31, 1995 at 20 (citing Thomas v. Peterson, 753 F.2d 754, 763 (9th Cir.1985)). The district court concluded that the contracts amounted to an "irreversible and irretrievable commitment of resources" and all contracts executed prior to completion of the required consultations with the FWS and the NMFS violated § 7(d). The district court invalidated all of the contracts which had been executed prior to the completion of the required consultations.
 
 
 19
 Judicial review of administrative decisions involving the ESA is governed by section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. A court may set aside an agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it was found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),(D); Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy, 898 F.2d 1410, 1414 (9th Cir.1990). The district court's summary judgment decision is reviewed de novo. Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997).
 
 B. Applicability of the ESA
 
 20
 As a threshold question, the Non-federal Defendants argue that the ESA did not apply to the contract renewals because the renewals were not "agency action." See 16 U.S.C. § 1536(a)(2). This argument must fail. The term "agency action" has been defined broadly. In TVA v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Court stated:
 
 
 21
 One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of such species...." This language admits of no exception.
 
 
 22
 Id. at 173, 98 S.Ct. 2279. See also Pacific Rivers, 30 F.3d at 1055 ("Following the Supreme Court's lead in TVA, we have construed 'agency action' broadly.") The regulation defining agency action states:
 
 
 23
 Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies.... Examples include, but are not limited to: ... the granting of licenses, contracts, leases, easements, rights-of-way, permits or grants in aid.
 
 
 24
 50 C.F.R. § 402.02. Clearly, negotiating and executing contracts is "agency action."
 
 
 25
 Orange Cove, the Madera Irrigation District (Madera) and Chowchilla Water District (Chowchilla) contend that the Bureau had no discretion to alter the terms of the renewal contracts, particularly the quantity of water delivered.[3] Where there is no agency discretion to act, the ESA does not apply. Sierra Club v. Babbitt, 65 F.3d 1502, 1509 (9th Cir.1995). The federal reclamation laws, which provided the right to renewal, state that the government is to renew the contracts on "mutually agreeable" terms, 43 U.S.C. § 485h-1(1), that water rights are based on the amount of available project water, 43 U.S.C. § 485h-1(4), and that the Secretary of the Interior (Secretary) has the discretion to set rates to cover an appropriate share of the operation and maintenance costs, 43 U.S.C. § 485h(e). Clearly, there was some discretion available to the Bureau during the negotiation process.
 
 
 26
 Orange Cove points to the opinion of the Solicitor of the Interior that the Bureau had no discretion for purposes of a NEPA analysis. Orange Cove argues that this opinion was entitled to deference. The opinion, however, only addresses the applicability of NEPA, not the ESA. Even if this opinion were relevant, the district court correctly concluded that the Solicitor's opinion was inconsistent with the requirements of the ESA. First, the opinion began from the premise that the government did not intend to make any substantial changes in the renewal contracts. The Solicitor, however, did not conclude that there was no discretion to change the terms of the contracts. He wrote:
 
 
 27
 If the Secretary exercises his discretion to make other substantial changes in the contracts at the time of renewal, then analysis must be undertaken to determine whether the exercise of discretion qualifies for a categorical exclusion from preparation analysis under NEPA.... [While there is no discretion to alter the quantity of water received ... the] Secretary has considerable discretion, however, to change other terms of the renewed contracts.
 
 
 28
 The Solicitor concluded that there was no discretion to change the quantity of water delivered under the contracts because the districts have "a first right ... to a stated share or quantity of the project's available water supply...." (Citing 43 U.S.C. § 485h-1(4)). The Solicitor, however, assumed that the "project's available water supply" included all of the Friant dam water, and he did not address the issue of whether the total amount of available project water could be reduced in order to comply with the ESA or state law. See O'Neill v. United States, 50 F.3d 677, 686 (9th Cir.1995) (noting that an agency can deliver less than a contractually agreed upon amount of water in order to comply with subsequently enacted federal law). Therefore, even if the original contracts guaranteed the Non-federal Defendants a right to a similar share of available water in the renewal contracts, the Bureau had discretion to alter other key terms in the contract, and the Bureau may be able to reduce the amount of water available for sale if necessary to comply with ESA.
 
 C. Procedural Violations of the ESA
 1. Failure to Consult with the NMFS
 
 29
 Before initiating any agency action in an area that contains threatened or endangered species or a critical habitat, the agency must (1) make an independent determination of whether its action "may affect" a protected species or habitat, or (2) initiate a formal consultation with the agency that has jurisdiction over the species. See generally Peterson, 753 F.2d at 763. If an agency determines that an action "may affect" critical species or habitats, formal consultation is mandated. Id.; 50 C.F.R. § 402.14(a). Formal consultation is excused only where (1) an agency determines that its action is unlikely to adversely affect the protected species or habitat, and (2) the relevant Service (FWS or NMFS) concurs with that determination. 50 C.F.R. § 402.14(b); see Pacific Rivers, 30 F.3d at 1054, n. 8.
 
 
 30
 The NMFS has jurisdiction over the winter-run chinook salmon, which was listed as a threatened species prior to execution of all but one of the water contracts. The Bureau independently determined that the renewal contracts and recommitment of all the Friant dam's water were not likely adversely to affect the salmon. The Bureau then sought the NMFS' concurrence with that assessment. On November 1, 1991, the Director of the NMFS refused to concur in the Bureau's opinion that the salmon would not be adversely affected. However, the NMFS also stated that formal consultation was not required. The Director wrote:While we disagree with the Bureau's determination that renewal of the Friant contracts are not likely to affect the winter-run [chinook salmon] adversely ... we do not believe that a formal consultation on the Friant contract renewals is necessary.... [T]he issue of delta exports is being addressed in our ongoing consultation on the CVP ... and we believe this will allow us to address the adverse impacts from the activities interrelated to the renewal of the Friant contracts.
 
 
 31
 The Bureau then proceeded to execute the water contracts without requesting a formal consultation with the NMFS. The Bureau argued that it reasonably relied on the NMFS' determination that a formal consultation was unnecessary.
 
 
 32
 The Non-federal Defendants cite Stop H-3 Ass'n v. Dole, 740 F.2d 1442 (9th Cir.1984), and Pyramid Lake, 898 F.2d 1410, to support their argument that the Bureau's reliance on the NMFS opinion was not arbitrary and capricious. These cases, however, do not support the Non-federal Defendants' position. Unlike both Stop H-3 and Pyramid Lake, the issue in this case is not whether the Bureau was arbitrary and capricious in relying on a properly issued Biological Opinion. Instead, the issue is whether the Bureau was arbitrary and capricious when it relied on the NMFS' view that a consultation was not necessary, despite NMFS' refusal to provide the required concurrence. By relying on the NMFS in this case, the Bureau did not meet its independent responsibilities under the ESA.
 
 
 33
 The Bureau had an affirmative duty to ensure that its actions did not jeopardize endangered species, and the NMFS letter clearly disagreed with the agency's determination of no adverse impact. See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Under those circumstances, regardless of the NMFS position that a formal consultation was "unnecessary," the Bureau had a clear legal obligation to at least request a formal consultation. See 50 C.F.R. §§ 402.13, 402.14. The reason that the NMFS gave for stating that a consultation was unnecessary was not supported by statute or regulation and had no rational relationship to the Bureau's independent obligations to ensure that its proposed actions were not likely adversely to affect the salmon. The district court did not err in concluding that it was arbitrary and capricious for the Bureau to forgo a formal consultation with the NMFS where the NMFS specifically refused to provide the required concurrence of "no adverse impact." Where the Bureau executed these 40-year contracts without first obtaining either the required concurrence from NMFS that the proposed action was not likely to affect a threatened species or a properly issued NMFS "no jeopardy" Biological Opinion, the Bureau acted arbitrarily and capriciously and not in accordance with the law. Therefore, all of these contracts were subject to rescission.
 
 2. Untimely Consultation with the FWS
 
 34
 In addition to failing to request and follow through with a required consultation with NMFS, the Bureau also failed to follow its obligations under law with respect to its consultation with the FWS. The FWS has jurisdiction over several protected species in the Friant area, and the Bureau informally consulted with the FWS during 1990 and 1991. Formal consultation was requested on May 22, 1991. The FWS issued a "no jeopardy" Biological Opinion on October 15, 1991. Ten of the Friant contracts had already been executed by that time. The contracts contained Article 14, which allowed some contract modification pursuant to environmental review, and all but one of the contracts contained a provision modifying the terms dependent on the outcome of this litigation.[4]
 
 Section 7(d) of the ESA provides:
 
 35
 After initiation of consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.
 
 
 36
 16 U.S.C. § 1536(d); see 50 C.F.R. § 402.09. The district court concluded that the 40-year water contracts constituted an irreversible and irretrievable commitment of resources and that the Bureau was not permitted to proceed until FWS found that the contracts were not likely to affect a protected species.[5] See Pacific Rivers, 30 F.3d at 1056 (following discussion of § 7(a)(2) and § 7(d), court concluded that "timber sales constitute per se irreversible and irretrievable commitment of resources"); Lane County Audubon Soc'y v. Jamison, 958 F.2d 290, 295 (9th Cir.1992).
 
 
 37
 The Non-federal Defendants insist that even if the water contracts are an irreversible and irretrievable commitment of resources, Article 14 prevented the foreclosure of reasonable and prudent alternatives and, therefore, § 7(d) was not violated. We do not think that an agency should be permitted to skirt the procedural requirements of § 7(d) by including such a catchall savings clause in illegally executed contracts. However, even if such a clause could preserve the contracts, Article 14 is inadequate to serve that purpose here because it limits conservation-based modifications to minor adjustments and prohibits an adjustment in the amount of water delivered. Because Article 14 does not permit a reduction in the quantity of water delivered, the reasonable and prudent alternative of reallocating contracted water from irrigation to conservation is foreclosed. The district court did not err in concluding that the Bureau violated § 7(d) when it executed the contracts prior to completing the formal consultation process with the FWS, and the contracts executed prior to the issuance of the FWS Biological Opinion are subject to rescission.[6]
 
 3. Mootness
 
 38
 The Non-federal Defendants argue that if the Bureau violated the ESA by executing the water contracts prior to the issuance of the FWS Biological Opinion, this claim became moot once a "no jeopardy" biological Opinion was issued on October 15, 1991.[7] In the May 31, 1991, Order, the district court concluded that the Biological Opinion did not moot the procedural ESA violations because the issuance of the Biological Opinion did not provide all the relief that could have been granted. The district court concluded that an appropriate remedy was still available--contract rescission--which would place the Plaintiffs in the position they would have been had the ESA been complied with before execution of the contracts.
 
 
 39
 Mootness is a question of law reviewed de novo. Native Village v. Blatchford, 38 F.3d 1505, 1509 (9th Cir.1994). The Non-federal Defendants rely on Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724 (10th Cir.1997), as persuasive authority that the ESA claim was mooted. In Southern Utah an informal consultation completed after the agency action mooted the ESA claim. However, Southern Utah is distinguishable because (1) there was no irreversible and irretrievable commitment of resources, and (2) the only relief requested was the completed consultation.
 
 
 40
 Procedural violations of the ESA are not necessarily mooted by a finding by the FWS that a substantive violation of the ESA had not occurred. The process, which was not observed here, itself offers valuable protections against the risk of a substantive violation and ensures that environmental concerns will be properly factored into the decision-making process as intended by Congress. Also, due to the procedural violations here, the Plaintiffs' ability to enjoin the agency action while they challenged the validity of the Biological Opinion was negated.[8]
 
 
 41
 Here, if the Biological Opinion had been rendered before the contracts were executed, the FWS would have had more flexibility to make, and the Bureau to implement, suggested modifications to the proposed contracts. See 50 C.F.R. § 402.14(g)(6), (j) (Service's responsibilities include formulating "discretionary conservation recommendations, if any, which will assist ... agency in reducing or eliminating the impacts it may have on listed species or critical habitats"). Even where there is a "no jeopardy" Biological Opinion, the Service may make non-binding conservation recommendations. 50 C.F.R. § 402.14(g)(6), (j). The failure to respect the process mandated by law cannot be corrected with post-hoc assessments of a done deal.
 
 D. Remedy of Contract Rescission
 
 42
 Where an agency acts arbitrarily or capriciously or not in accordance with the law, the APA states that the court shall set aside the agency action. 5 U.S.C. § 706(2)(A)-(D). While the court had the discretion to preserve the contracts if the procedural flaw could have been rectified in another way, see Weinberger v. Romero-Barcelo, 456 U.S. 305, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), there is no reason to compel that result here.
 
 
 43
 In Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1230 (9th Cir.1988), the court stated that "the proper remedy for substantial procedural violations of NEPA and the ESA is an injunction." In that case, however, the government had been enjoined by the district court from entering into more leases and the leases that were already entered into were set aside. Also, the agency action at issue did not appear to involve an irreversible and irretrievable commitment of resources. In Forelaws on Board v. Johnson, 743 F.2d 677, 685 (9th Cir.1984), although we refused to issue an injunction, we noted that for NEPA violations, injunctions served the purpose of "preserv[ing] the decision makers' opportunity to choose among policy alternatives." Id. Where contracts have already been entered into, the opportunity to "choose" has been eliminated--all that remains is the limited ability to make the path chosen as palatable as possible. Therefore, an injunction would not serve any purpose if the contracts are not invalidated. We conclude that the district court's decision to rescind the contracts was not an abuse of discretion.
 
 
 44
 E. Unique Issues Related to Particular Contracts
 
 1. Orange Cove
 
 45
 Orange Cove is uniquely situated from the rest of the Non-federal Defendants. First, the Orange Cove contract was the only contract that was executed after the Bureau and the FWS had concurred that the contract was not likely adversely to affect any protected species. Therefore, for the Orange Cove contract alone, a formal consultation with the FWS was not required before contract execution and the ESA was not violated on those grounds.
 
 
 46
 The district court concluded, however, that even though the ESA was not violated because of a flawed FWS consultation, the failure to consult with the NMFS before executing the Orange Cove contract resulted in a procedural violation. The Orange Cove contract, however, was also the only contract executed before the winter-run chinook salmon was listed as threatened in August of 1989. Orange Cove argues that because its contract was executed before the salmon was listed, the Bureau had no duty to consult with the NMFS, formally or informally, under the ESA.
 
 
 47
 The district court, on Orange Cove's motion for reconsideration, concluded that until Orange Cove had the contract validated in state court,[9] the Bureau had the power and the obligation to withdraw the contract and initiate consultation with the NMFS after the salmon was listed in August, 1989. Orange Cove argues that the district court improperly decided the validation argument because it was not addressed by the parties in their summary judgment briefs. Orange Cove also argues that the district court erred as a matter of law.
 
 
 48
 Orange Cove implicitly raised the validation argument when it moved for reconsideration and pointed out to the court that its contract was executed prior to the threatened species listing. The Orange Cove contract, on its face, states that it is not binding on the United States until it is validated in state court. Both sides had an opportunity to address this argument in writing a year before the district court issued its January 16, 1997, Order.
 
 
 49
 Orange Cove argues that after the contract was executed in May, 1989, there was no "agency action" that would require reinitiation of an ESA consultation. However, even though the government was not under a contractual obligation to deliver water to Orange Cove from February 28, 1989, until February 22, 1990, the government continued to do so and that activity constituted discretionary agency action. The ESA regulations state that "[r]einitiation of formal consultation is required and shall be requested ... where discretionary Federal involvement or control over the action has been retained or is authorized by law and ... a new species is listed...." 50 C.F.R. § 402.16. The discretionary activity of delivering water without a contract, coupled with the fact that the Orange Cove contract explicitly stated that the United States was not bound by the contract until it was validated in state court, support the district court's conclusion that the Bureau had an obligation to withdraw the contract and initiate an NMFS consultation once the salmon was listed. See Pacific Rivers, 30 F.3d at 1053-56 (ESA consultation required for ongoing projects once new threatened species listed). We conclude that the district court did not err in setting aside the Orange Cove contract.
 
 2. Chowchilla and Madera
 
 50
 Chowchilla and Madera argue that their contracts are unique from the other Non-federal Defendants because Madera and Chowchilla had originally possessed the land where the Friant dam was built and had adjudicated rights to the water of the San Joaquin River. In return for conveying the land and the water rights to the United States, Madera and Chowchilla argue that their 1939 contracts guaranteed a permanent supply of water from the Friant dam of 270,000 acre feet of water annually. That contract was replaced by a 1951 contract. Madera and Chowchilla argue that when the 1951 contract expired, they were reinvested with their rights under the 1939 contract and, therefore, they are exempt from the ESA. However, in Madera Irrigation Dist. v. Hancock, 985 F.2d 1397, 1405-06 (9th Cir.1993), the court concluded that these districts are not exempt from requirements under NEPA and the ESA. Chowchilla's and Madera's arguments to the contrary are without merit.
 
 
 51
 3. Chowchilla, Terra Bella and Delano-Earlimart
 
 
 52
 Chowchilla, the Terra Bella Irrigation District and the Delano-Earlimart Irrigation District argue that even though their contracts were executed by the Bureau prior to the issuance of the FWS Biological Opinion, all three were validated by the state court after the October 15, 1991, "no jeopardy" Biological Opinion was issued. Therefore, they argue that the validation date serves to keep their contracts from violating the ESA.
 
 
 53
 This argument was not raised in the district court and we decline to consider it for the first time on appeal. See Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1487 n. 4 (9th Cir.1995) (failure to raise issue before the district court constitutes a waiver of that issue).
 
 II. National Environmental Policy Act
 
 54
 NEPA requires all federal agencies to consider the environmental consequences of all "major Federal actions significantly affecting the quality of the human environment" by preparing an EIS before undertaking the action. 42 U.S.C. § 4332(2)(C). Instead of preparing an EIS, an agency may make a factual determination that an EIS is unnecessary by conducting an environmental assessment (EA) of its proposed action and issuing a Finding of No Significant Impact (FONSI) on the environment. See 40 C.F.R. § 1501.4; Sierra Club v. United States Forest Serv., 843 F.2d 1190, 1193 (9th Cir.1988). NEPA is not retroactive and only applies to major agency actions that occurred after 1969.
 
 
 55
 It is undisputed that the Bureau did not prepare an EA or an EIS before renewing these water contracts. The Bureau argues that there is no need for this court to address the NEPA issue because if these 14 contracts are rescinded, then the Plaintiffs have received complete relief. The CVPIA requires the government to complete an EIS before it may enter into any subsequent Friant renewal contracts. CVPIA, Pub.L. 102-575, § 3404(c)(1), 1992 U.S.C.C.A.N. (106 Stat.) at 4709. Where intervening legislative changes settle a controversy, the action may be moot. Nevada v. Watkins, 943 F.2d 1080, 1083 (9th Cir.1991). We conclude that the NEPA issue has been mooted by the remedy of contract rescission and CVPIA's requirement that an EIS be completed on this dam before the re-execution of the contracts.
 
 III. Section 5937 of the Fish and Game Code
 
 56
 Section 5937 of the California Fish and Game Code states:
 
 
 57
 The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam.
 
 
 58
 In the Order of April 30, 1992, the district court concluded that the Bureau was not exempt from § 5937 and denied the motion to dismiss. See 791 F.Supp. at 1431-36. The district court also concluded that the CVPIA did not preempt § 5937. See Order of October 7, 1993. In the January 16, 1997, Order, the district court concluded that, due to the contract invalidations, the § 5937 claim was not ripe. We hold that the district court erred and remand for a determination on the merits.
 
 
 59
 Ripeness is a question of law reviewed de novo. San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1124 (9th Cir.1996). A case is generally considered ripe if: (1) the relevant issues are sufficiently focused to permit judicial resolution without further factual development, see Clinton v. Acequia, Inc., 94 F.3d 568, 572 (9th Cir.1996); and (2) the parties would suffer a hardship by the postponement of judicial action, see Abbott Lab. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Where the Bureau is not complying with § 5937 and its obligation to comply with § 5937 is in dispute, a determination of the § 5937 issue is ripe. The rescission of the 14 water contracts is unrelated to the timeliness of the § 5937 claim. The § 5937 claim is directed towards the owner of the dam, the Bureau, whose duty to comply with state law, if the law applies, exists independent of any contractual arrangements with the Non-federal Defendants.
 
 
 60
 The Non-federal defendants challenge the district court's ruling that § 5937 was not, on its face, preempted by federal law. We affirm on the facial preemption issue.
 
 Section 8 of the Reclamation Act provides:
 
 61
 Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws....
 
 
 62
 43 U.S.C. § 383. In California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), the Court stated that the "cooperative federalism" of § 8 required the United States to comply with state water laws unless such a law was directly inconsistent with clear congressional directives regarding the project. Id. at 650, 678, 98 S.Ct. 2985. On remand to the Ninth Circuit, this court concluded that the term "congressional directive" meant a preemptive federal statute. United States v. California, 694 F.2d 1171, 1176-77 (9th Cir.1982).
 
 
 63
 The CVPIA provides that Friant dam water is not to be released from the Friant dam to comply with the provisions of the CVPIA regarding the development of a plan to reestablish fish below the dam. CVPIA, Pub.L. No. 102-575, § 3406(c)(1), 1992 U.S.C.C.A.N. (106 Stat.) at 4721.[10] The Non-federal Defendants argue that this provision is a clear congressional directive that water is not to be released from the Friant dam pursuant to any law, state or federal, until it is specifically approved by Congress. However, the statute states that there are not to be any releases of the Friant dam water "as a measure to implement this title," this title being the CVPIA. It would have been a simple matter for Congress to bar the release of Friant dam water, without including the clause "as a measure to implement this title" twice in the same sentence. There is no clear directive in the CVPIA which preempts the application of § 5937 if the state law could be implemented in a way that is consistent with Congress' plan to develop and restore fisheries below the Friant dam in a manner that is "reasonable, prudent, and feasible." CVPIA, Pub.L. 102-575, § 3406(c), 1992 U.S.C.C.A.N. (106 Stat.) at 4721.
 
 
 64
 The district court, as the Bureau points out, never explicitly ruled that § 5937 applied to the Friant dam. There are several other issues that the district court did not address. For example, the district court did not determine whether § 5937 is applicable to the Friant dam under state law. It is preferable to determine whether the state law applies before reaching a determination that state law has been preempted. The district court also did not reach the issue of whether the actual application of § 5937 is inconsistent with the CVPIA. It has yet to be determined how much water release would be required under § 5937 and whether that would be consistent with the CVPIA. We remand these issues to the district court for a determination on the merits.
 
 IV. Improper Use of Evidence
 
 65
 With their summary judgment motion, the Plaintiffs filed three expert affidavits which addressed the environmental impacts of the Friant dam. The Non-federal Defendants filed a motion to strike these affidavits which the court denied. The Non-federal Defendants claim that these affidavits addressed disputed factual issues, and that they were not permitted to cross-examine the experts or conduct discovery to respond to the assertions in the affidavits. In the Order of May 31, 1995, the district court appears to rely on these affidavits, in part, and stated that the Plaintiffs' "extensive scientific ecological evidence documents" indicated that the total diversion of the river caused environmental harm. The Non-federal Defendants contend that the district court abused its discretion in denying further discovery in violation of Fed.R.Civ.P. 56(f). The Non-federal Defendants also claim that the affidavits were irrelevant to the legal questions at hand.
 
 
 66
 We review the district court's discovery rulings for an abuse of discretion. Amarel v. Connell, 102 F.3d 1494, 1515 (9th Cir.1996). The district court may continue a motion for summary judgment if the opposing party needs time to conduct further discovery. See Fed.R.Civ.P. 56(f); Garrett v. City and County of San Francisco, 818 F.2d 1515, 1518 (9th Cir.1987). A refusal to permit further discovery pursuant to Rule 56(f) is reviewed for an abuse of discretion. Nidds v. Schindler Elevator Corp., 113 F.3d 912, 920 (9th Cir.1996), cert. denied --- U.S. ----, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). "We will only find that the district court abused its discretion if the movant diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment." Qualls v. Blue Cross of Cal., Inc., 22 F.3d 839, 844 (9th Cir.1994).
 
 
 67
 The Non-federal Defendants' Rule 56(f) argument is without merit. The Non-federal Defendants never formally filed a Rule 56(f) motion requesting a continuance of the summary judgment hearing to conduct further discovery. They contend that their motion to strike should have served as a Rule 56(f) motion. But that motion, which was not made until six months after the summary judgment decision was issued, was clearly untimely for Rule 56(f) purposes. Regardless of whether the Non-federal Defendants raised a timely 56(f) motion or diligently pursued discovery, the Non-federal Defendants have not pointed to any evidence that they could have discovered that would have precluded summary judgment. See Garrett, 818 F.2d at 1518.
 
 
 68
 On the relevancy issue, the Plaintiffs assert that the expert affidavits were relevant to the legal issue of whether the water contracts were an irreversible and irretrievable commitment of resources. The district court did rely on the declarations regarding environmental harm to conclude that there was an irreversible and irretrievable commitment of resources. However, it appears that the court could have reached the same legal conclusion without any concrete evidence of ecological harm. See Pacific Rivers, 30 F.3d at 1057 (timber sales constitute per se irreversible and irretrievable commitment of resources). Therefore, if there were any error it was harmless.
 
 CONCLUSION
 
 69
 We conclude that the Bureau violated the ESA by making irreversible and irretrievable commitments of resources prior to completing the required consultations with the FWS and the NMFS. The remedy of contract rescission was well within the district court's discretion. The NEPA issue is moot. However, we reverse the holding that the § 5937 claim was unripe and remand for a determination of that issue. The Plaintiffs shall recover their costs on appeal from the Non-federal Defendants. The Federal Defendants shall bear their own costs on appeal.
 
 
 70
 AFFIRMED in part, REVERSED and REMANDED in part.
 
 
 
 [1]
 All of the Non-federal Defendants, except for the Friant Water Users Authority, have water service arrangements with the Bureau
 
 
 [2]
 The Bureau does not challenge the district court's determination that there was an ESA violation or the remedy of contract rescission
 
 
 [3]
 This issue was raised for the first time on a motion for reconsideration which the district court addressed in its Jan. 16, 1997, Order
 
 
 [4]
 The Orange Cove contract did not include this provision. That contract was the first contract renewed and it was executed prior to the court's order requiring all future contracts to contain such a provision. However, the Bureau and the FWS had informally consulted and mutually agreed that the Orange Cove contract was not likely adversely to affect any listed species
 
 
 [5]
 The district court also concluded that there was a per se violation of the ESA even if the contracts in this case were not an irreversible and irretrievable commitment of resources. We need not decide whether the district court was mistaken because there was an irreversible and irretrievable commitment of resources
 
 
 [6]
 The district court also correctly concluded that if the Bureau is not permitted to execute contracts that constitute an irreversible and irretrievable commitment of resources during the formal consultation, it also was not permitted to do so before it had initiated formal consultation. See 16 U.S.C. § 1536(d); Pacific Rivers, 30 F.3d at 1056-57; Conner v. Burford, 848 F.2d 1441, 1455 (9th Cir.1988). Therefore, all contracts executed prior to May 22, 1991, violated the ESA
 
 
 [7]
 This argument only applies to the ESA violation arising out of the FWS consultation process. Even if the untimely FWS consultation could be mooted by the issuance of a "no jeopardy" opinion, the failure to consult with NMFS still renders the contracts subject to rescission
 
 
 [8]
 In the district court, the Plaintiffs challenged the validity of the FWS "no jeopardy" Biological Opinion. This claim was dismissed without prejudice because the contract rescission offered complete relief
 
 
 [9]
 Clause 30 of the Orange Cove contract provides as follows:
 The Contractor, after execution of this contract, shall promptly seek to secure a decree of a court of competent jurisdiction of the State of California, confirming the execution of this contract. The Contractor shall furnish the United States a certified copy of the final decree, the validation proceedings, and all pertinent supporting records of the court approving and confirming this contract, and decreeing and adjudging it to be lawful, valid, and binding on the Contractor. This contract shall not be binding on the United States until such final decree has been secured.
 Contract between the United States and the Orange Cove Irrigation District (emphasis added).
 
 
 [10]
 Section 3406(c)(1) of the CVPIA provides:
 The Secretary shall ... develop a comprehensive plan, which is reasonable, prudent, and feasible, to address fish, wildlife, and habitat concerns on the San Joaquin River ... During the time that the Secretary is developing the plan provided for in this subsection, and until such time as Congress has authorized the Secretary to implement such plan ... the Secretary shall not, as a measure to implement this title, make releases for the restoration of flows between Gravelly Ford and the Mendota Pool and shall not thereafter make such releases as a measure to implement this title without a specific Act of Congress authorizing such releases.