MONTANA WILDERNESS ASSOCIA-
TION, a non-profit corporation, and
CURLEY YOUPEE, an enrolled
member of the Fort Peck Tribes, indi-
vidually, Plaintiff,

v.

Tom FRY, Acting Director, U.S. Bureau
of Land Management; Mat Millen-
bach, Director, Montana–Dakotas
State Office, U.S. Bureau of Land
Management; Jamie Rappaport
Clark, Director, U.S. Fish & Wildlife
Service; U.S. Bureau of Land Man-
agement; U.S. Fish & Wildlife Ser-
vice; and Macum Energy, Inc., a Mon-
tana corporation, Defendants.

CV 00–39–GF–DWM.

United States District Court,
D. Montana,
Great Falls Division.

Jan. 12, 2006.

Michael P. Adams, William P. Pendley, D. Andrew Wight, Mountain States Legal Foundation, Lakewood, CO, Alan L. Joscelyn, Gough, Shanahan, Johnson & Waterman, Helena, MT, for Defendant Macum Energy, Inc.

George F. Darragh, Jr., Office of the U.S. Attorney, Great Falls, MT, for Defendant U.S. Bureau of Land Management, United States Fish and Wildlife Service.

Cathy J. Lewis, Ugrin, Alexander, Zadick & Higgins, Great Falls, MT, for Plaintiff Montana Wilderness Association.

Dennis J. Tighe, Davis, Hatley, Haffeman & Tighe, PC, Great Falls, MT, for

Plaintiff Montana Wilderness Association, Curley Youpee.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction

By Order dated March 31, 2004, I found the Bureau of Land Management ("BLM") in violation of National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the National Historic Preservation Act ("NHPA") in its sale of three leases to Macum Energy and its grant of a pipeline right-of-way to Macum. This order concerns the appropriate remedy for these violations. An evidentiary hearing with respect to the remedy was held on January 14, 2005.[1] After listening to a day of evidence on the equities and public interests at play in this matter, in my view the three Macum Energy leases at issue should remain suspended pending full compliance with the directives set forth in the March 31, 2004 Order. The pipeline shall likewise remain shutdown pending the BLM's compliance with the order on summary judgment.

### II. Discussion

#### A. The Proper Scope of Injunctive Relief

■ "The proper remedy for substantial procedural violations of NEPA and the ESA is an injunction." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1230 (9th Cir.1988). In issuing an injunction, the district court must balance the equities between the parties and give due regard to the public interest. *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833 (9th Cir.2002). A third party's potential financial damages from an injunction generally do not outweigh potential harm to the environment. *National Parks & Cons.*

*Ass'n*, 241 F.3d at 738. If the question of injunctive relief raises important factual issues, the scope of the injunction is to be determined by the district court. *National Parks & Conservation Assn. v. Babbitt*, 241 F.3d 722, 738 (9th Cir.2001) (quoting *Alaska Wilderness Recreation & Tourism Assn. v. Morrison*, 67 F.3d 723, 732 (9th Cir.1995)).

■ The district court's equitable powers are broad, and it is within the court's authority to fashion a remedy that fits the particular facts of the case before it. Moreover, a district court has the power to fashion a remedy that ensures full compliance with the law. In this case there are two options with respect to the leases. One is to permanently suspend the leases until the NEPA process is complete. The other more drastic option is to void the leases and the right-of-way. *See Kettle Range Conservation Group v. U.S. Bureau of Land Management*, 150 F.3d 1083 (9th Cir.1998).

The Ninth Circuit affirmed the rescission of water contracts in a case in which the Bureau of Reclamation issued the 40-year contracts without first complying with its obligations under the ESA. *Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir.1998). It did so even though a "no-jeopardy" Biological Opinion was issued during the pendency of the litigation. "The process, which was not observed here, itself offers valuable protections against the *risk* of a substantive violation and ensures that environmental concerns will be properly factored into the decision-making process as intended by Congress." *Id.* at 1128–29. In affirming the remedy of contract rescission, the court stated, "Where contracts have already been entered into, the opportunity

---

1. The March 31, 2004 Order details the factual background of this case, which will not be repeated here.

to 'choose' has been eliminated—all that remains is the limited ability to make the path chosen as palatable as possible. Therefore, an injunction would not serve any purpose if the contracts are not invalidated." *Id.* at 1129.

With respect to the pipeline right-of-way, the choice for injunctive relief is between 1) shutting down the pipeline pending compliance with NEPA, ESA and NHPA; 2) shutting down the pipeline permanently but leaving it in place so as to avoid the adverse environmental impacts of removal; and 3) requiring that the pipeline be removed.

### B. Macum's Leases

#### 1. Evidence Presented at the Hearing

Plaintiffs put on a great deal of evidence of the potential impacts of gas activities by showing other sites where erosion, weed infestation, and flooding had occurred. Timothy Faber, a long-time user of the area, showed photographs and testified to the changes he has seen over the last few decades as gas leasing has increased in the Bullwhacker area. He discussed his perception of the impacts of gas development on wildlife, including increased scarcity of certain species, and on the physical environment, including increased roads, unauthorized off-road vehicle access, erosion, and invasive weeds. Faber testified that his enjoyment of the natural area had lessened considerably with the increase in gas development.

Plaintiffs' experts also testified to the harms to wildlife that follow such development. Dr. Janice Thomson, a landscape scientist, discussed the fragmentation of wildlife habitat that can result from human activities in a landscape. Dr. Thomson showed maps that demonstrate that the Monument area is among the least roaded areas in Montana and discussed the effects of roads on wildlife. Dr.

Thomson testified that roads are an inevitable result of gas development; they have been identified in the scientific literature as having a extensive impact on wildlife, including habitat fragmentation, noise, dust, traffic, facilitation of other disturbing human activities, and introduction of weeds, among other things. Dr. Thomson outlined specific impacts on mule deer, elk, bighorn sheep, and pronghorn, all species found in the Monument. She concluded that the best alternative to protect wildlife in the Monument would be to disallow new roads and close some existing roads. On cross-examination, BLM's counsel emphasized that Macum's leases/sites are much smaller than the ones in the Wyoming study which concluded that gas development is detrimental to wildlife in the area.

Plaintiffs' expert Dr. Kyron Kunkel, a wildlife biologist, testified to similar negative impacts related to gas leasing. His position was that wildlife habitat in the Monument area is in a delicate condition as it stands, and any further development or impacts would have negative consequences for wildlife. Dr. Kunkel used maps to demonstrate areas of great concern for wildlife species and the proximity of those areas to the lease areas at issue here. Dr. Kunkel concluded the best way to protect the various species of the Monument was not to develop the Macum leases and to prevent other further development.

Dr. Peter Morton, a resource economist for the Wilderness Society, testified that preserving wildlands for other than resource extraction is an increasingly valuable use of the land. Dr. Morton showed graphs demonstrating that amenities other than oil and gas development were a significant part of Montana's rural economy. Dr. Morton testified to the high value Montanans put on wildlife, and his final conclusion was that the economic and environmental benefits of protecting the Bull-

whacker area would likely outweigh the economic benefits of gas development. He concluded that these wells would probably not significantly improve the economy of Blaine County.

Finally, Plaintiffs' expert Thomas Schneider, an experienced petroleum engineer, testified to what Plaintiffs see as the "marginal" potential productivity of these leases, thereby suggesting their possible financial and economic benefits are far outweighed by their possible harms.

The BLM presented the testimony of Martin Ott, State Director of the BLM for Montana and the Dakotas. Mr. Ott discussed the procedures the BLM has undertaken to comply with this court's orders and environmental laws. He claimed that recision of the leases would be contrary to the will of the people because the monument designation intended for existing gas leases to continue operating. The declaration, according to Mr. Ott, "clearly spoke to the multiple use nature of the monument." Mr. Ott also thought the country's need for energy, as expressed in President Bush's energy plan, tips the balance in favor of gas development. There is also revenue from the leases, and he suggested all of these things must be balanced against the wildlife, riparian, and other non-economic values. Despite his clear preference for issuing the leases, Mr. Ott expressed conviction that the BLM would still be able to give the leases their requisite "hard look." Mr. Ott's testimony appeared to express a belief that suspending the leases pending the NEPA process would merely be a hiccup, and the leasing would go forward eventually, reaping the benefits of the gas production. In his view, rescinding the leases forecloses the public's opportunity to reap those benefits. The Court questioned Mr. Ott on his answers, because Mr. Ott's statement that a FONSI would follow the public comment period suggested that he had already decided on his intended course, and that the public comment was irrelevant. Upon further questioning, however, he assured the Court that he would only make the final decision after the public comment period. Mr. Ott did seem to feel an obligation to preserve the leases because they had already been sold. On cross-examination, Plaintiffs' counsel established that the range of options would not include a no-lease option, but would include, as the least impacting, an option of NSO, up to development with stipulations.

Defendants' next witness, Howard Lemm, is the BLM's deputy state director for resources in the Billings office. He described discussions in the lead-up to issuing these leases and expressed the view that then-Secretary of the Interior Bruce Babbit had multiple uses in mind when the monument was created, and these leases were sold with the belief they were consistent with the monument designation. Mr. Lemm also discussed the typical BLM lease restrictions that prevent gas development on areas of particular environmental sensitivity, such as steep slopes and stream buffer areas. Mr. Lemm testified that if there is so much other gas activity in that area, but these leases are not developed, then gas that is in effect under federal land—and therefore subject to federal royalties and lease payments—could be extracted through a well on private land, resulting in the public's loss of whatever financial benefit that gas would provide.

BLM's next witness was Donato Judice, field station supervisor for the BLM's Great Falls oil and gas field station. He discussed the pipeline right of way, the price paid for the line, its location, and the potential harms related to its removal. He also showed some pictures of various well sites and discussed the short time required and minimal impacts involved in drilling new wells.

Macum Energy called two witnesses. First, Macum called the owner and operator of Macum Energy, Ralph Gailey. Mr. Gailey explained his business and the background of his leases on the Leroy gas field. He paid $38,000 for these leases, plus yearly rental fees. Mr. Gailey also testified that he has spent approximately $1.2 million in development in this area, but has recouped about half of that so far in gas production. Mr. Gailey discussed the financials of the wells and showed several photographs of various well sites to demonstrate their unobtrusiveness and successful reclamation.

The hearing's final witness was Larry Kraus, a petro-engineer. Mr. Kraus analyzed the seven Macum wells to determine their future productivity, economic feasibility, and net worth. Mr. Kraus concluded that Macum's wells hold gross reserves about of 1.1 million MCF, with profits of about $2.3 million. This includes currently operating, though perhaps not producing, wells. The predicted lifetimes of the wells is ten to thirty years. Mr. Kraus' analysis conflicts with Plaintiffs' allegations that the wells are almost dry. Kraus explained how compressors can be used to increase flow from these wells and how some of the wells require "remedial work" in order to reach their productive potential.

### 2. The Balance of Interests With Regard to the Leases

As is noted in the March 31, 2004 Order, a NEPA violation will usually result in a simple remand of the issue to the agency before any action has taken place. On other occasions, an injunction and remand would be fruitless, such as when a NEPA—violating timber harvest has already been completed. There is no remedy for the fallen timber.

This case falls awkwardly in between. On the one hand, action has been taken without a proper EIS. However, unlike replacing a harvested tree, this action can, to a certain extent, be undone. The Court can rescind the Macum leases and restore Macum to the position it occupied before the illegal leasing, or allow Macum to keep its leases but disallow any development pending NEPA compliance by the BLM. Neither option truly puts the parties and the public back where they were before the BLM's process went off the rails. If the court simply enjoins activity pending the release of a new EIS and ROD that allow gas production, Macum will benefit from the monument's grandfather clause allowing such activities. In that case, both Macum and the BLM will have achieved their original goals, albeit with great delay and expense. Also, the public's interest in the NEPA process will be degraded if the process is reduced to a series of hurdles to be cleared en route to a predetermined result.

On the other hand, rescinding the leases instead suspending them would result in Macum never operating on these leases in the monument, because the monument designation prohibits new gas leases.

There is some minuscule economic benefit to be derived from the operation of Macum's leases. If Macum is allowed to develop wells on the three leases at issue, those wells, assuming they are productive, will potentially create revenue for the state and federal governments in the form of royalties and taxes. In 2004, that amounted to over $49,000 in royalties, and a little over $8,000 in production taxes. Def.'s Ex. 702. Most of the economic benefit will go to the company operating the wells, not the public, although some portion of Mr. Macum's three million dollars of projected earnings will likely be spent in Montana. There is also the suggestion that America needs natural gas, so we would all benefit by having more of it available, even if that means sacrificing the environment or giv-

ing a nod and a wink to half-hearted observance of environmental laws and procedure.

These suggested economic benefits must be weighed against the harms of gas leasing, which are undeniable. Fortunately, I am in a position to suspend all activity detrimental to the environment pending BLM's compliance with the law. That way, the environmental impact of gas leasing is evaluated by the entity best suited to conduct such an assessment, which is not the Court but the agency itself. There is a caveat: Policies not enacted by Congress should not be the driving force in the implementation of environmental law decisions.

A new EIS must incorporate the information about the monument designation, and should therefore increase the emphasis on non-resource extraction concerns. If Plaintiffs are correct about both the potential harms of the leasing and the lack of real productivity in these wells, then the final EIS result would be a NSO restriction on the leases. That would achieve the benefits that Defendants see from developing the wells and minimize the harms.[2]

This case raises a concern over BLM's ability to fulfill its procedural obligations without favoring a predetermined outcome. Mr. Ott's testimony leaves the strong impression that he is motivated by an executive policy to maximize energy development. The wheels are in motion. He testified his mind was not made up and that he would reserve judgment until after the process was complete. However, as the Ninth Circuit has pointed out, "bureaucratic rationalization and bureaucratic momentum are real dangers, to be anticipated and avoided by [the agency] ..." *Northern Cheyenne v. Hodel,* 851 F.2d 1152, 1157

(9th Cir.1988). In *Northern Cheyenne,* the Court concluded the risk of this momentum was not great, because "the Tribe failed to demonstrate any significant difference between voiding and suspending the leases ..." *Id.,* at 1157. Here there is a great difference.

Much of the evidence produced at the remedy hearing was, as Assistant United States Attorney George Darragh repeatedly pointed out, the type of evidence the BLM should consider when it produces its EIS and evaluates the public's options. The environmental and mining information adduced in the hearing distracts from the most basic premise of Congress' environmental laws: the public interest is best served when the law is followed. Suspending the leases and letting the legal process proceed should be enough to meet the public's interest, regardless of whether the evidence presented at the hearing shows that the leases in the monument are a bad idea. The issues involved here raise the question of whether there is a mandate to develop the least intrusive remedy yet protect all concerned interests. Rescinding the leases reaches the ultimate conclusion that the monument is better preserved under the law without these leases. But that puts the Court in the role of the EIS decision maker, a role the Court is not supposed to assume.

The appropriate injunctive relief with regard to the gas leases is a continued suspension of activity on those leases pending full compliance by the BLM with this Court's March 31, 2004 Order. Compliance must include a valid oil and gas leasing EIS and ROD. Upon completion of the procedural steps necessary to comply with that Order and with NEPA, ESA and

---

**2.** I note that Plaintiffs apparently do not believe that even NSO leases are sufficient safeguards against degradation of habitat, because, among other reasons, any gas de-

velopment activity in the area will have both its own effects and the knock-on effects of opening the area to further unauthorized uses.

NHPA, the Defendants shall submit to the Court a request for dissolution of the injunction. At that point, the Plaintiffs will have an opportunity to state their position with respect to dissolution of the injunction.

## C. Pipeline

■ There are seven wells connected to the disputed pipeline. I found the original EA for the pipeline was insufficient, not because it was improperly tiered to the West HiLine EIS, but because there was no public process involved in reaching the FONSI conclusion. BLM also violated NHPA by failing to consider the cultural consultant's report and consult with appropriate parties before issuing the right of way to Macum. I ordered the BLM to issue a new EA and get public comment before issuing a new Record of Decision.

### 1. Evidence Presented at the Hearing

At the hearing, Mr. Ott testified that the EA would be published soon, public comments would be received, and then a decision would be issued. It was clear from the testimony that a FONSI was likely.[3]

Plaintiffs agreed with Defendants that removal of the pipeline would be expensive and even more environmentally damaging. Plaintiffs advocated, through the testimony of Tom Schneider, requiring "fully adequate" bonding to mitigate and cover costs of the pipeline's impacts on the Monument, including full abandonment bonds for the pipeline and all wells connected to it. Schneider testified that allowing currently legal wells to continue to operate, though offensive, makes the best of a bad situation, because it limits further pipeline activity in the Monument.

The factors to be considered here are the same as with regard to the leases. If the BLM completes its EA and complies with environmental laws, the public's interest is not furthered by any greater restriction in the use of the pipeline. The bonding concerns are important; the pipeline was put in under the West HiLine EIS, which did not contemplate the monument. Therefore, the pipeline was originally installed in an environment in which the unique natural values of the area were not yet fully studied or acknowledged. I believe it would be a sufficient compromise to increase the abandonment and reclamation bonds on the wellheads in order to ensure that the money exists to minimize whatever impacts the wells and pipeline will have.

The appropriate injunctive relief with regard to the pipeline is that it continue to be shut down pending BLM's completion of, at the very least, an EA that complies with NEPA, ESA and NHPA followed by the issuance of a FONSI or the preparation of an EIS and ROD if necessary. Upon completion of the procedural steps necessary to comply with NEPA, ESA and NHPA, the Defendants shall submit, if appropriate, a request for dissolution of the injunction. At that point, the Plaintiffs will have an opportunity to state their position with respect to dissolution of the injunction.[4]

### III. Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that the suspension of surface-disturbing activity on the three Macum leases and the prohibition on opera-

3. BLM has since issued a new EA and FONSI with regard to the pipeline, dated June 8, 2005.

4. The Defendants have indicated that they believe the BLM has fully satisfied its proce-

dural obligations through the issuance of the EA and FONSI dated June 8, 2005. *See* Macum Energy's Reply to Plaintiffs' Response to Macum Energy's Notice Regarding Macum's Pipeline, dated October 5, 2005.

tion of the pipeline shall continue pending compliance by the BLM with its statutory obligations as set forth in this Court's March 31, 2004 Order granting summary judgment in favor of Plaintiffs. Following compliance with NEPA, ESA, NHPA and the March 31, 2004 Order, the Defendants may move, if appropriate, for the dissolution of this injunction. The Plaintiffs will then have an opportunity to state their position regarding BLM's compliance with the March 31, 2004 Order.

IT IS FURTHER ORDERED that the amount of each abandonment and reclamation bond on the existing wells and the pipeline is increased from $25,000.00 to $100,000.00.