**ENVIRONMENTAL PROTECTION IN-FORMATION CENTER, INC., a non-profit corporation; Sierra Club, Inc., a non-profit corporation, Plaintiffs,**

v.

**PACIFIC LUMBER COMPANY, a De-laware corporation; Scotia Pacific Holding Company, a Delaware corpo-ration; Salmon Creek Corporation, a Delaware corporation, Defendants.**

No. C–98–3129 MHP.

United States District Court,
N.D. California.

May 5, 1999.

---

Brian Gaffney, Oakland, CA, Sharon E. Duggan, Law Offices of Sharon E. Duggan, San Francisco, CA, Tara L. Mueller, Oakland, CA, Brendan Cummings, Berkeley, CA, Richard M. Pearl, Richard M. Pearl Law Offices, San Francisco, CA, for Plaintiffs.

Bruce S. Flushman, Edgar B. Washburn, David M. Ivester, Christopher J. Carr, Washburn Briscoe & McCarthy, San Francisco, CA, Jared G. Carter, Frank Shaw Bacik, Carter Behnke Oglesby & Bacik, Ukiah, CA, for Defendants.

### MEMORANDUM AND ORDER

PATEL, Chief Judge.

Plaintiffs Environmental Protection Information Center ("EPIC") and Sierra Club bring this action against defendants Pacific Lumber Company ("PALCO") and its subsidiaries Scotia Pacific Holding Company and Salmon Creek Corporation alleging violations of section 7(d) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(d), and seeking declaratory and injunctive relief. On March 15, 1999, this court issued a final order granting plaintiffs' motion for preliminary injunction prohibiting PALCO from conducting or allowing any logging activities of any kind within the boundaries of Timber Harvest Plans ("THP") Nos. 1–96–413 HUM, 1–96–307 HUM, and 1–97–286 HUM.

Now before the court is a motion for partial summary judgment filed by plaintiffs and a motion for summary judgment and/or to dismiss by defendants on grounds that this action is moot. At oral argument on March 15, 1999, the court further issued an order to show cause why this action should not be dismissed as moot. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

### BACKGROUND [1]

Underlying this dispute are lands which are subject to an agreement between PAL-CO and its parent company, MAXXAM, Inc., the federal government and the state of California to preserve a 7,500 acre tract of old growth redwood forest in Humboldt County, California. The agreement is commonly known as the "Headwaters Agreement." The Headwaters Agreement originally anticipated the exchange of the tract of old growth forest for federal and state assets with a value of $300 million and other properties. The Headwaters Agreement also called for, among other things, the development and submission by PALCO of an incidental take permit ("ITP") application pursuant to section 10(a)(1)(B) of the ESA, 16 U.S.C. § 1539(a)(1)(B).

On June 12, 1998, PALCO applied for an ITP to the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively, "the Services"). See 63 Fed.Reg. 37900 (July 14, 1998). The ITP sought would authorize PALCO to incidentally take 17 listed species and some species that are currently not but may become listed during a fifty-year period on approximately 211,000 acres of land owned by PALCO and its subsidiaries. These lands include areas within the Mattole River watershed and the Sulphur Creek and Bear Creek drainages, which according to plaintiffs, are the critical habitats of several species listed as threatened or endangered under the ESA, including the coho salmon ("coho"). In July 1998, in conjunction with its permit application, PALCO submitted a proposed Habitat Conservation Plan ("HCP") in accordance with the requirements of ESA section 10(a)(2)(A), 16 U.S.C. § 1539(a)(2)(A), and a proposed Implementation Agreement. 63 Fed.Reg. at 37900.

The Services subsequently issued a notice of receipt and availability for public comment for PALCO's permit application, HCP, and proposed Implementation Agreement pursuant to the notice and public comment requirement of section

---

1. The facts of this action presented to this time are discussed in full in the court's order

dated March 15, 1999, on plaintiff's motion for preliminary injunction.

10(c) of the ESA. 63 Fed.Reg., at 37900–01. On November 16, 1998, the FWS and NMFS initiated "formal consultation" on the Services' proposal to issue an ITP to PALCO pursuant to section 10(a)(1)(B) and its implementing regulations at 50 C.F.R. Parts 17 and 222, respectively. *See* Letter dated November 16, 1998 from the Services to John Campbell ("November 16 letter"). The Services also stated:

> Based on the initiation of formal consultation, the provisions of section 7(d) of the Act and 50 C.F.R. 402.09 now apply. Under Section 7(d) PALCO may make no irreversible or irretrievable commitment of resources that would have the effect of foreclosing the formulation or implementation of any reasonable or prudent alternatives which would avoid violating section 7(a)(2) of the Act.

*Id.*

On January 22, 1999, the Services issued a notice of availability of the joint final Environmental Impact Statement/Environmental Impact Report ("EIS/EIR") and Habitat Conservation Plan ("HCP")/Sustained Yield Plan ("SYP") relating to the issuance of the ITPs. 64 Fed.Reg. 3483 (Jan. 22, 1999). The notice of availability states that decisions on the action for which the EIS/EIR was prepared "will occur no sooner than February 22, 1999." *Id.* In part, the final EIS/EIR is intended to "indicate any irreversible commitment of resources that would result from implementation of the final proposed action." *Id.* at 3485. On February 24, 1999, the Services issued a Biological/Conference Opinion ("BO") on PALCO's request for the ITPs. On February 25, 1999, the Services also finalized their Record of Decision ("ROD") supporting the issuance of the ITP and related actions. The ITP was issued on February 26, 1999, to be effective on March 1, 1999, upon finalization of the Headwaters Agreement. On March 1, 1999, the Headwaters Agreement was finalized and both the BO and the ITPs were released.

In its BO, the NMFS determined that the issuance of the ITP is neither "likely to jeopardize the continued existence" of the Southern Oregon/Northern California Coast ("SONCC") Evolutionary Significant Unit ("ESU") coho, nor "likely to destroy or adversely modify proposed critical habitat" of the SONCC ESU coho. ROD, App.B at 12. The BO also states in closing:

> This concludes formal consultation and conference on the action outlined in the request. As provided in 50 C.F.R. § 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

BO at 416–17.

*LEGAL STANDARD*

A. *Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial … since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630

(9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations, *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505, and the inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

### B. *Mootness*

■ "A claim is moot if it has lost its character as a present, live controversy." *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118, 1123 (9th Cir.1997) (citing *American Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1407 (9th Cir.1995)). Where the activities sought to be enjoined have already occurred, and the courts "cannot undo what has already been done, the action is moot." *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir.1978). On the other hand, issues which are "capable of repetition, yet evading review" provide an exception to the mootness doctrine. *American Rivers*, 126 F.3d at 1123–24 (citing *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). This exception is "limited to extraordinary cases in which: (1) the duration of the challenged action is too short to be fully litigated before it ceases; and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again." *Alaska Fish & Wildlife Fed'n and Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 939 (9th Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988). "The burden of demonstrating mootness is a heavy one." *Northwest Environmental Defense Center v. Gordon*, 849 F.2d 1241, 1243 (9th Cir.1988).

### C. *Analytical Framework for the Endangered Species Act*

The ESA contains both substantive and procedural provisions designed to protect endangered species and their habitat. *See* 16 U.S.C. §§ 1531–1548. Section 9 of the ESA makes it unlawful for any person to "take," i.e., to harm, kill or harass, any listed endangered species of fish or wildlife within the United States unless an incidental take permit ("ITP") or other exemption is obtained pursuant to section 10 of the ESA. 16 U.S.C. § 1538. In order to qualify for an ITP, a permit applicant must submit a habitat conservation plan that includes, among other things, the steps an applicant will take to minimize and mitigate impacts on endangered species and alternative actions being considered. 16 U.S.C. § 1539(a)(2)(A).

Section 7(a)(2) imposes a procedural duty on the federal agencies to consult with the FWS or NMFS, depending on the protected species, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16 U.S.C. § 1536(a)(2). An agency "action" is defined to mean all activities carried out by federal agencies, including, among other things, the granting of licenses and permits. *See* 50 C.F.R. § 402.02. "If a contemplated agency action may affect a listed species, then the agency must consult with the Secretary of the Interior, either formally or informally." *American Rivers*, 126 F.3d at 1122.

■ If the agency determines that its action is "likely to adversely affect" a protected species, it must engage in formal consultation. 50 C.F.R. § 402.14(a). "Formal consultation is excused only where (1) an agency determines that its action is unlikely to adversely affect the protected species or habitat, and (2) the relevant service (FWS or NMFS) concurs with that determination." *Natural Re-*

sources Defense Council v. Houston, 146 F.3d 1118, 1126 (9th Cir.1998), pet. for cert. filed, —— U.S. ——, ——, 119 S.Ct. 1754, 143 L.Ed.2d 786 (1999) (citations omitted). Formal consultation is a process that "commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act." Id.; 50 C.F.R. § 402.14(a). An ITP, by its very nature, is issued to a permit applicant because its activities may result in the "taking" of listed species, and therefore, "may affect" those species. See 16 U.S.C. § 1539(a); Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1055 (9th Cir.1994), cert. denied, 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995).

Once the consultation process is initiated, section 7(d) prohibits the federal agency and the permit or license applicant from "making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives which would avoid jeopardizing the continued existence of listed species or resulting in the adverse modification of critical habitat." 50 C.F.R. § 402.01; 16 U.S.C. §§ 1536(a)(2) & (d). See also Houston, 146 F.3d at 1127 & 1128 n. 6 (Bureau of Land Management not permitted to make an irreversible or irretrievable commitment of resources either during or prior to the initiation of formal consultation); Pacific Rivers Council, 30 F.3d at 1056 (prohibiting commitment of resources prior to initiation of consultation process for activities which "may affect" listed species); 63 Fed.Reg. 8859, 8862 (Feb. 23, 1998) (in Services' case, issuance of ITP prior to or during consultation is violation of 7(d)). Although PALCO maintains that the section 7(d) prohibition applies only to federal agencies, but not private parties, section 7(d) expressly applies to private actors such as PALCO whose activities require formal federal authorization. See 16 U.S.C. § 1536(d) (prohibiting both federal agencies and "the permit or license applicant" from irretrievably committing resources); 50 C.F.R. § 402.02.

Finally, section 7(b) of the ESA and its implementing regulations set forth in 50 C.F.R. Part 402, subpart B, provide for consultation procedures and guidelines. See 16 U.S.C. § 1536(b). The Services are required to complete "formal consultation" within 90 days after its initiation but this deadline may be extended under certain conditions. 50 C.F.R. § 402.14. The formal consultation process "concludes with the Services' issuance of the biological opinion under section 7(b)(3) of the Act" describing how the action affects the protected species and its critical habitat. 50 C.F.R. § 402.02; 16 U.S.C. § 1536(b)(3)(A). If the action is found to jeopardize the listed species or adversely modify its critical habitat, the Secretary must suggest reasonable and prudent alternatives that will avoid the likelihood of jeopardy or adverse modification. Id. Once the consultation process has ended and a BO has issued, the responsibility rests with the federal agency to determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Services' BO. 50 C.F.R. § 402.15.

## DISCUSSION

Two issues are raised by this round of motions: (1) whether the litigation is moot after the issuance by the Services of the BO and ITPs on March 1, 1999; and if not moot, (2) whether the section 7(a)(2) consultation requirement, and thereby, section 7(d)'s prohibition against the "irreversible or irretrievable commitment of resources," are applicable to the Services' consideration of PALCO's ITP application. Before reaching the threshold jurisdictional question of mootness, the court initially addresses, by way of clarification of its order on plaintiffs' motion for preliminary injunction, whether the section 7 consultation requirements apply to PALCO's application for an ITP pursuant to section 10(a)(1)(B). However, because the court finds the action to be mooted by the close of the consultation period, it does not

reach the questions posed by plaintiff's motion for partial summary judgment.

### I. *Interaction of Sections 7 and 10*

In its supplemental briefing to plaintiffs' motion for preliminary injunction, defendants raised the novel argument that the section 7(a)(2) consultation requirement is not meant to apply to the Services' consideration of permit applications pursuant section 10(a). Instead, PALCO asserted that section 10(a) sets forth self-contained procedural requirements for processing permit applications and that application of section 7's consultation requirements are unnecessarily duplicative. PALCO also contends that the ESA's statutory scheme does not readily encompass any form of "internal" consultation within the Services. In its preliminary injunction order, the court briefly addressed the questions raised by PALCO without the benefit of an opposition from plaintiffs. *See* Order dated March 15, 1999, at 23–25. However, at this stage, plaintiffs have weighed in on the question of the proper interpretation of the interaction of section 7 and section 10, and the court finds it necessary to clarify its prior order on this issue.

 When interpreting a statute, the court should "look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 830 (9th Cir.1996). If the statute is unclear or ambiguous, the court may then look to the legislative history to determine what Congress intended. *Id.* at 830–31. Neither the plain language of the ESA nor the Services' interpretation regarding the applicability of the section 7 consultation requirement during the ITP approval process support PALCO's argument. The plain language of section 7(a)(2) simply requires that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary" insure that any agency action is not likely to jeopardize the continued existence of a protected species or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2). PALCO dissects this language. It argues that "Secretary" is synonymous with either the FWS or the NMFS, and as a result, reading section 7(a)(2) to require intra-agency consultation renders it nonsensical. The plain language of section 7(a)(2), however, refers only to the phrases "Secretary" and to "[e]ach Federal agency." The statute does not expressly refer to either the NMFS or FWS, and therefore, the Services are not exempt from the consultation requirement. In fact, other agencies which fall within the jurisdiction of the Secretary of the Interior, such as the Bureau of Land Management ("BLM"), are not exempt from the consultation requirement. *See Houston*, 146 F.3d at 1126–27. However, by following PALCO's reasoning, the BLM would also be exempt from the section 7(a)(2) consultation requirement because the "Secretary" should not be required to consult with "himself." This is not the case.

 PALCO also points to similar language in section 7(a)(1) of the ESA in contending that section 7(a)(2) does not require the sort of intra-agency consultation presently undertaken by the Services. *See* 63 Fed.Reg. at 8861–62. Section 7(a)(1) states in full:

> The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. *All other Federal agencies shall, in consultation with and with the assistance of the Secretary,* utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

15 U.S.C. § 1536(a)(1) (emphasis added). The court in *Pyramid Lake Paiute Tribe v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1417 n. 15 (9th Cir.1990), sought to reconcile the scope of the duties imposed by section 7(a)(1) and those imposed by ESA

section 2(c)(1), 16 U.S.C. § 1531(c)(1), which makes a similar policy declaration that *"all Federal departments and agencies* shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(c)(1) (emphasis added). The *Pyramid Lake* court distinguished the phrase "[a]ll other Federal agencies" in section 7(a)(1) to require

> that in exercising their duty to conserve, *non-Interior Department agencies* must do so in consultation with the Secretary. After all, it would have made no sense for Congress to have required the Interior Department, as lead agency for implementing the Act, to consult with itself.

*Pyramid Lake,* 898 F.2d at 1417 n. 15 (emphasis added). No such conflict, however, arises between the language in section 7(a)(1) and section 7(a)(2) since the two subsections use distinct language. Section 7(a)(1) directs "[a]ll *other* federal agencies" to consult with the Secretary, whereas section 7(a)(2) requires that *"[e]ach* federal agency" consult with the Secretary. The latter phrase clearly includes *all* federal agencies both within and without the Department of the Interior. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. U.S.,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

PALCO next asserts that sections 7 and 10 impose duplicative requirements upon the Services and contends that therefore Congress did not intend that the two provisions should operate in conjunction. Both section 7 and section 10 provide mechanisms for obtaining a statutory exception to the section 9 prohibition against the taking of listed species. *See Ramsey v. Kantor,* 96 F.3d 434, 442 (9th Cir.1996); 16 U.S.C. § 1536(*o*); 50 C.F.R. § 402.14(i)(5). Section 7 requires the federal agencies to consult with the Secretary, and at the con-

clusion of consultation, the Secretary is required to provide to the agency an opinion and summary of how the agency action affects the species or its critical habitat. 16 U.S.C. §§ 1536(a)(2) & (b)(3)(A). If the Secretary concludes that the agency action or incidental taking will not violate section 7(a)(2), or offers reasonable and prudent alternatives, the Secretary is required to provide the agency and permit applicant an incidental take statement that specifies the impact of the incidental taking on the species, reasonable and prudent measures that minimize the impact of the action or incidental taking, and sets forth terms and conditions of compliance with the suggested alternative measures. 16 U.S.C. § 1536(b)(4). Incidental takings in compliance with the terms and conditions specified in the incidental take statement as required under section 7(b)(4)(iv) are not considered takings in violation of section 9. 16 U.S.C. § 1536(*o*)(2).

Congress added the permitting scheme set forth in section 10(a) in 1982 in order to allow persons not engaged in activities requiring federal authorization to incidentally take listed species. H.R.Conf.Rep. No. 835, 97th Cong., 2d Sess. 29 (1982), *reprinted in,* 1982 U.S.C.C.A.N. 2860, 2870 (1982) (section 10 addresses "the concerns of private landowners who are faced with having otherwise lawful actions not requiring Federal permits prevented by section 9 prohibitions against taking"). In order to obtain an ITP, the applicant must submit an HCP that specifies, *inter alia,* the "impact" of the proposed incidental take, the steps to be taken by the ITP applicant "to minimize and mitigate such impacts," and the alternative actions considered by the applicant and why such alternatives were rejected. 16 U.S.C. § 1539(a)(2)(A). Section 10(a)(2)(B) sets forth several statutory criteria to be considered by the Secretary in deciding whether to issue an ITP. One of these statutory criteria—whether "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild"—is based on the Services' regulatory definition of the section

7(a)(2) "jeopardize the continued existence of" standard.[2] *Compare* 16 U.S.C. § 1539(a)(2)(B)(iv) *with* 50 C.F.R. § 402.02; *see also* H.R.Conf.Rep. No. 835, 97th Cong., 2d Sess. at 29, *reprinted in*, 1982 U.S.C.C.A.N. at 2870 ("Secretary will base his determination as to whether or not to grant the permit, in part, by using the same standard as found in section 7(a)(2) of the Act, as defined by Interior Department regulations"); 61 Fed.Reg. 63854, 63856 (Dec. 2, 1996). Although the two sections contain similar requirements, they do not entirely overlap. For example, in fulfilling the consultation requirements of section 7(a)(2), the agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Moreover, in responding to concerns that the section 7 process was "overly burdensome" to ITP applicants, the Services stated that:

> section 7 and its regulations introduce several considerations into the HCP process that are not explicitly required by section 10—specifically, indirect effects, effects on federally listed plants, and effects on critical habitats.

61 Fed.Reg. at 63856. Section 7 clearly imposes distinct requirements from section 10, and as such, the court does not find it to be duplicative or overly burdensome.

The Services confirm the conclusion that section 7 requires an intra-Services consultation regarding the issuance of each permit application under section 10(a)(1)(B). In responding to commentators' concerns regarding the Services' adherence to the section 7 consultation requirements in connection with a "no-surprises" policy in providing regulatory assurances to the holder of a Habitat Conservation Plan (HCP) incidental take permit issued under section 10(a), the NMFS and FWS jointly stated:

> The Services are committed to meeting their responsibilities under section 7(a)(2) of the ESA. *As required by law, the Services conduct a formal intra-Ser-*
> *vice section 7 consultation regarding the issuance of each permit issued under section 10(a)(1)(B).* The purpose of any consultation is to insure that any action authorized, funded, or carried out by the Federal government, including the issuance of an HCP permit, is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat of such species.

63 Fed.Reg. at 8861–62 (emphasis added). Similarly, the Habitat Conservation Planning Handbook issued by the Services specifically provides for an "internal" section 7 consultation prior to the issuance of an ITP. *See* Habitat Conservation Planning Handbook at 6–11 to 6–16, http://www.fws.gov/r9endspp/hcp/hcpbook.htm.

The court gives "deference to a reasonable interpretation of a statute by an administrative agency charged with its implementation." *Ramsey*, 96 F.3d at 442 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

Clearly, PALCO's application for an ITP and its subsequent issuance by the Services is an "agency action" which falls within the ambit of the section 7 consultation requirement. *See* 50 C.F.R. § 402.01. "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. The issuance of an ITP requires the discretionary involvement of the Secretary. "Each Federal agency" is required to review its actions to determine whether "any action" may affect listed species or critical habitat. 50 C.F.R. § 402.13. An "action" is defined by the Services to include "all activities of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "actions intended to conserve listed species or their habitat," the granting of licenses and permits, or actions di-

---

**2.** Other criteria to be considered by the Secretary prior to issuing an ITP include whether the taking will be incidental, whether the applicant will to the maximum extent practicable minimize and mitigate the impacts of such taking, and whether the applicant will ensure that adequate funding for the plan will be provided. 16 U.S.C. § 1539(a)(2)(B).

rectly or indirectly causing modifications to the land, water, or air. 50 C.F.R. § 402.02. The issuance of an ITP to PAL-CO is undoubtedly an "agency action." Also, formal consultation is required under section 7(a)(2) because the issuance of an ITP to PALCO clearly "may affect" coho salmon. *See Pacific Rivers Council,* 30 F.3d at 1055 (U.S. Forest Service land management plans were "actions that 'may affect' the protected salmon because the plans set forth criteria for harvesting resources within the salmon's habitat"); 50 C.F.R. § 402.14. Thus, once consultation was initiated in connection with PALCO's ITP application, PALCO and the Services were subject to section 7(d)'s prohibition against an irreversible or irretrievable commitment of resources.

Although the plain language of section 7 and its implementing regulations are clear and unambiguous, the court nonetheless looks to the legislative history of the ESA for the sake of completeness. A cursory review of the history of the ESA does not compel a contrary conclusion. PALCO traces the evolution of the language of section 7(a)(2) of the ESA from its original enactment in 1973, but sheds little light on the interaction of section 7 and section 10. PALCO notes that the original section 7(a) included only two sentences, which together comprised what are now sections 7(a)(1) and 7(a)(2):

The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. *All other Federal departments and agencies* shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act and by taking such action necessary to insure that action authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of

such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical.

Endangered Species Act of 1973, Pub.L. No. 93–205 § 7, *reprinted in,* 1973 U.S.C.C.A.N. 979, 989 (1973) (emphasis added). In 1978, section 7(a) was amended by Congress to read:

The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. *All other Federal agencies* shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act. *Each Federal agency* shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") does not jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section.

Endangered Species Act Amendments of 1978, Pub.L. No. 95–632 § 3, 92 Stat. 3752 (1978) (emphasis added). Given the evolution of section 7 since 1973, PALCO now asserts that sections 7(a)(1) and 7(a)(2) should be read in conjunction and that "[e]ach Federal agency" should be read as "each such Federal agency." However, PALCO provides no authority for reading into section 7(a)(2) the word "such" and, given that both the 1973 Act and the 1978 amendments pre-date the enactment of the section 10 permitting process, the court

finds that the legislative history of the precursors to the present section 7 does not reflect on the interaction of section 10 with the section 7 consultation requirement.

PALCO also points to the House Conference Report to the Endangered Species Act Amendments of 1982, Pub.L. No. 97–304, 96 Stat. 1411 (1982), which states that:

> The Secretary will base his determination as to whether or not to grant the permit, in part, by using the same standard as found in section 7(a)(2) of the Act, as defined by Interior Department regulations, that is whether the taking will appreciably reduce the likelihood of the survival and recovery of the species in the wild. Use of the regulatory language adopted by the Secretary of the Interior to implement section 7(a)(2) rather than the language of the provision itself eliminates the implication that other permits issued under section 10 do not require consultation and biological opinions issued pursuant to section 7.

H.Conf.Rep. No. 835, 97th Cong., 2nd Sess. 29–30 (1982), *reprinted in*, 1982 U.S.C.C.A.N. at 2870–71. Although PALCO asserts that the above paragraph establishes that Congress intended to eliminate the section 7 consultation requirement for incidental take permits under section 10(a)(1), the above-quoted language simply emphasizes that section 7(a)(2) consultation is required prior to the issuance of "other permits under section 10" and not that the consultation requirement is eliminated in the consideration of ITP applications.

In conclusion, both the plain language and the Services' interpretation of section 7 clearly establish that the consultation requirement applies equally to the Services' actions in connection with the issuance of an ITP pursuant to section 10(a)(1)(B) as it does to other federal agency actions that may affect endangered or threatened species.

## II. *Mootness*

The BO and ITPs were issued by the Services on March 1, 1999, and because of this, PALCO asserts that this action is now moot. PALCO makes the reasonable argument that because "formal consultation is terminated with the issuance of the biological opinion," 50 C.F.R. § 402.14(*l*)(1), and section 7(d) applies only during the consultation process, plaintiffs can no longer be accorded the relief they seek. In pointing to paragraph 1 of plaintiffs' prayer for relief, PALCO stresses that plaintiffs seek to forestall the irreversible or irretrievable commitment of resources only during section 7(a)(2) consultation.

In their complaint, plaintiffs initially frame the scope of their action, stating that:

> This is an action for declaratory and injunctive relief in which Plaintiffs challenge Defendants' irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation and implementation of any reasonable and prudent alternative measures in violation of Section 7(d) of the ESA.

Compl., at ¶ 2. In their first claim for relief, plaintiffs also allege that PALCO is

> in violation of Section 7(d) of the ESA by irreversibly and irretrievably committing resources, effectively foreclosing the formulation or implementation of reasonable and prudent alternatives, through carrying out timber harvest activities pending completion of the required consultation process.

Compl., at ¶ 60. Finally, as relief, plaintiffs seek a declaratory judgment that PALCO is in violation of section 7(d) and:

> An order enjoining PALCO from carrying out any timber harvest and related activities that are irreversible or irretrievable commitments of resources in violation of Section 7(d) of the ESA, *unless and until the required consultation with FWS and NMFS is completed* and the Incidental Take Permit requested by PALCO is granted or denied, or

unless PALCO withdrawals [*sic* ] its application for an Incidental Take Permit and is therefore no longer a "permit or license applicant" under Section 7 of the ESA.

Compl., Prayer for Relief ¶¶ 1 & 2 (emphasis added). Thus, plaintiffs seek only to forestall during the consultation period the irreversible or irretrievable commitment of resources by PALCO that have the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives. The federal agencies are not parties to this action nor do plaintiffs make the broader complaint that the federal agencies have failed to "insure" that the issuance of the ITP is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat.

PALCO draws a parallel to this action from the facts and holding of *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727–30 (10th Cir.1997), in arguing that the completion of consultation moots plaintiffs' section 7(d) claim. In *Southern Utah*, plaintiff alleged that the Bureau of Land Management ("BLM") violated section 7(a)(2) by failing to initiate consultation with the Services prior to implementing a land management guidance schedule and sought limited injunctive relief only to compel BLM to enter into section 7(a)(2) consultation. The court held plaintiff's action was rendered moot because the BLM had completed "informal" consultation and obtained written concurrence from the Services, although it had not completed the consultation process prior to implementing the management schedule. *Id.* at 728–29. The court further rejected plaintiff's argument that relief could be had because the BLM failed to complete the consultation prior to, rather than after, the agency's action. In doing so, the court noted that no relief could

be afforded because "subsequent consultation," as initiated and completed, was precisely the relief sought by plaintiff. *Id.*

The *Houston* court distinguished *Southern Utah* because "(1) there was no irreversible and irretrievable commitment of resources, and (2) the only relief requested was the completed consultation." *Houston*, 146 F.3d at 1129. In *Houston*, the U.S. Bureau of Reclamation executed several water contracts prior to the completion of section 7(a)(2) consultation and the issuance of the BO, which when subsequently issued made a "no jeopardy" finding. *Id.* at 1128–29. In responding to defendants' argument that the issuance of a "no jeopardy" opinion mooted the ESA claim, the court held that "[p]rocedural violations of the ESA are not necessarily mooted by a finding by the FWS that a substantive violation of the ESA had not occurred." *Id.* The court noted that the procedural violation "negated" plaintiffs' "ability to enjoin the agency action while they challenged the validity of the Biological Opinion." *Id.* The instant action likewise differs from *Southern Utah* because the remedy sought by plaintiffs is not the completion, initiation or re-initiation of consultation before or after the issuance of the ITP and BO, but rather, the prohibition of an irreversible or irretrievable commitment of resources under section 7(d) during the pendency of the consultation process.

In order to avoid the consequences of the narrow relief sought in the complaint, plaintiffs initially maintain that the section 7(a)(2) consultation should not be deemed "complete" if the BO issued by the Services is found to be inadequate. In doing so, plaintiffs only speculate that the BO may be *per se* inadequate because it may not have considered the effects of any resources irreversibly or irretrievably committed by PALCO during the consultation process.[3] In asserting a generalized

---

**3.** Plaintiffs also make the befuddling point that the BO may be inadequate because "the project proposed by the permit applicant has changed by operation of PALCO's action on

February 17, 1999." In support of this contention, plaintiffs simply note that PALCO notified the Services that the Headwaters Agreement would not be "consummated." See Pl.

challenge to the adequacy of the BO, plaintiffs seek to raise a cause of action under section 7(a)(2) of the ESA·or the Administrative Procedure Act, 5 U.S.C. § 704. Neither is alleged in this action. Plaintiffs' assertion that the BO is inadequate therefore forms a claim separate and distinct from the relief they seek under their section 7(d) claim against PALCO. Even if this court were to allow plaintiffs to raise a broad challenge to the adequacy of the BO, the absence of the Services or the Secretary of the Interior as parties to this action raises issues of notice and joinder.

 Moreover, neither the language of the ESA nor the implementing regulations support plaintiffs' contention that the consultation process is not "complete" upon issuance of a BO by the Services. For example, section 7(b)(3)(A) states that a biological opinion should issue "[p]romptly after conclusion of consultation under paragraph (2) or (3) of subsection (a) of this section." 16 U.S.C. § 1536(b)(3)(A). Similarly, as quoted above, 50 C.F.R. section 402.14(*l* )(1) clearly states that "formal consultation is terminated with the issuance of the biological opinion." Furthermore, the implementing regulations require the "re-initiation of consultation" where discretionary federal control or involvement over the action has been retained or authorized by law:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16. Both the statutory language of the ESA and its implementing regulations make clear that the consultation process terminates when a BO is issued by the Services.

Plaintiffs, however, also raise the narrower concern that this action is not moot to the extent that PALCO irreversibly committed resources that may have foreclosed the formulation and implementation of reasonable and prudent alternative measures.[4] It suggests, without specification, that the court could fashion some sort of relief for PALCO's "procedural" violation. The implementing regulations for section 7(d) state that the duty to refrain from making an irreversible or irretrievable commitment of resources remains in force during the consultation process and "continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. On the other hand, the language of section 7(d) itself clearly states that its duty begins only "[a]fter the initiation of consultation," but provides no clear statement as to when the duty that it imposes upon federal agencies or permit applicants ceases. 16 U.S.C. § 1536(d). Section 7(d) simply creates a bar to irreversibly committing resources in a manner "which would not violate section 7(a)(2)." *Id.; see generally Pacific Rivers Council v. Thomas*, 936

Reply at 4. The court does not see the direction of this argument or its relevance in light of the eventual "consummation" of the Agreement.

4. As a corollary to this argument, plaintiffs maintain that this court can retain jurisdiction because PALCO's irreversible commitment of resources may have caused a "continuing harm." See Northwest Environmental Defense Center v. Gordon, 849 F.2d 1241, 1245 (9th Cir.1988) (action not

moot where injuries resulting from 1986 fisheries management measures impact the formulation of the 1989 measures). Apparently, according to plaintiffs, this continuing harm arises from any impediment to the Services' formulation of reasonable and prudent alternatives created by the irreversible commitment of resources. As such, plaintiffs' "continuing harm" concern is in effect a challenge to the adequacy of the BO.

F.Supp. 738, 745–48 (D.Idaho 1996) (discussing scope and history of section 7(d)).

Some courts have noted that section 7(d)'s prohibitions are terminated when the consultation process ends. *Enos v. Marsh,* 616 F.Supp. 32, 62 (D.Haw.1984), *aff'd,* 769 F.2d 1363 (9th Cir.1985) (citing *Stop H–3 v. Lewis,* 538 F.Supp. 149 (D.Haw.1982)) (section 7(d) prohibition terminated when biological opinion is issued and consultation is terminated); *Silver v. Babbitt,* 924 F.Supp. 976, 983 (D.Ariz.1995) (noting that timber sales constitute irreversible commitment of resources under section 7(d) and cannot go forward during consultation period). In *Houston,* however, the court noted the process created by Congress in section 7(a)(2), "which was not observed here, itself offers valuable protections against the risk of a substantive violation and ensures that environmental concerns will be properly factored into the decisionmaking process as intended by Congress." *Houston,* 146 F.3d at 1128–29. The *Houston* court further noted that if the BO had been issued before the water contracts executed by the Bureau of Reclamation:

> the FWS would have had more flexibility to make, and the Bureau to implement, suggested modifications to the proposed contracts ... Even where there is a "no jeopardy" Biological Opinion, the Service may make non-binding conservation recommendations.

*See Houston,* 146 F.3d at 1129 (internal quotations omitted). It therefore rescinded the water contracts executed by the Bureau of Reclamation prior to the completion of consultation. *Id.*

Thus, where either a federal agency or a permit applicant, such as PALCO, has irreversibly or irretrievably committed resources in a manner foreclosing the formulation and implementation of reasonable and prudent alternative measures which avoid the destruction or adverse modification of critical habitat, it may be possible for the court to retain jurisdiction to fashion relief to the extent that the commitment of resources has impeded the federal agency's ability to formulate and implement reasonable and prudent alternative measures. As noted by the *Houston* court, "[t]he failure to respect the process mandated by law cannot be corrected with post-hoc assessments of a done deal." *Houston,* 146 F.3d at 1128. Furthermore, the relief available to plaintiffs may either be in the form of an injunction or otherwise. *See Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1230 (9th Cir.1988) (allowing injunctive for substantial procedural violations of ESA); *Houston,* 146 F.3d at 1129 (contract rescission permissible for procedural violation of section 7(d)). Nonetheless, the relief sought by plaintiffs is only the halt of any irretrievable commitment of resources by PALCO during the consultation period, and the injunction preliminarily imposed on PALCO has provided plaintiffs with the relief that they sought. The consultation period has now ended, and PALCO's duty to refrain from making any further irretrievable commitment of resources has ceased. This action is therefore moot. The court further notes that plaintiffs have provided the court with no basis whatsoever for concluding that PALCO's purported irreversible commitment of resources has impeded the Services' ability to insure that formulate or implement reasonable and prudent alternative measures. The court cannot sustain an action on the basis of mere speculation. Moreover, as noted above, a broader challenge to the BO issued by the Services is not contemplated by plaintiffs' complaint and does not form a basis for finding a live, present controversy.

Finally, plaintiffs make several other arguments asserting that a live, present controversy exists. Plaintiffs first argue that a legal dispute still exists simply because PALCO refuses to concede that sections 7(a)(2) and 7(d) apply to its ITP application. However, "a federal court does not have jurisdiction 'to give opinions upon moot questions or abstract propositions, or to declare principles or

rules of law which cannot affect the matter in issue in the case before it.'" *American Rivers,* 126 F.3d at 1123 (quoting *Church of Scientology v. U.S.,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). It is not enough for PALCO to continue to contest the validity of plaintiffs' legal arguments to sustain an action as a "present, live controversy."

 Plaintiffs also contend that this action is of a type that is "capable of repetition, yet evading review." In doing so, EPIC and Sierra Club assert that the Services will be required to initiate or reinitiate consultation at given intervals throughout the fifty-year span of the ITP. As plaintiffs further argue, because section 7(b) requires that consultation under section 7(a)(2) be concluded within a 90–day period from the date of initiation, challenges to any further irreversible commitment of resources by PALCO prior to amendments or changes to the HCP or ITP would become moot at the close of the consultation period and escape effective judicial review. Specifically, plaintiffs point to various provisions of the HCP and the Implementation Agreement that call for either the reinitiation of consultation during the span of the ITP or agency action by the Services to issue new or amended permits or alterations to the HCP.

The court briefly discusses some of these provisions. Plaintiffs first point to certain marbled murrelet conservation areas ("MMCA") that will be under protection for the first five years of the permit, but that may lose such protection at the end of that period if the Services find that allowing timber harvesting and other covered activities in these areas would not jeopardize the marbled murrelet. *See* HCP at § 6.1.2.1. Similarly, the HCP presently provides for the continued operations of hard rock quarries and borrow pits located within certain MMCAs during this five-year period. However, "[i]nclusion of borrow pits as a covered activity under the ITPs after the five-year period will require an amendment to the permit," thus requir-

ing the reinitiation of consultation. HCP at ¶ 6.1.2.3.3.

Moreover, the HCP provides for both the issuance of further permits and for amendments and renewals to the permits. *See* Implementation Agmt. at §§ 7.2.1 & 7.2.3. The provision allowing for the issuance of further permits expressly provides for section 7 consultation, although it contemplates reliance "to the maximum extent permitted by law" on the section 7 BO issued with regard to the approval of the HCP. *See id.* at § 6.1.3. Similarly, the Services interpret amendments to the HCP or ITP to be a "final agency action" and therefore subject to the consultation requirements. *Id.* at § 7.2.1. Finally, the Implementation Agreement allows for "adaptive management" which permits PALCO to propose changes to the Aquatics Conservation Plan that are then reviewed by a "peer review" panel. *See id.* at § 3.1.3.2. Apparently, "changes" to the HCP through adaptive management require agency approval and therefore may be considered to be agency action requiring the reinitiation of formal consultation under 50 C.F.R. § 402.16.

The court finds two cases instructive in resolving the "capable of repetition, yet evading review" issue. In *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1329 (9th Cir.1992), plaintiffs brought NEPA and ESA claims against the Pacific Fishery Management Council's total allowable catch ("TAC") regulation for the 1991 fishing season. Although the 1991 fishing season had ended and the 1991 TAC had expired and had been replaced with a 1992 TAC, the *Greenpeace Action* court held that the NEPA claim was not moot because it fell within the "capable of repetition, yet evading review" exception. *Id.* at 1329–30. The court based its decision on two factors: (1) the TAC was in effect for less than a year, making it difficult to obtain effective judicial review, and (2) the major issue in the case, whether the Secretary adequately examined the effects of fishing on sea lions, was likely to recur in

future years, in part because the Secretary relied on the same biological opinion in support of the 1992 TAC. *Id.*

In contrast, in *Northwest Resource Information Center v. NMFS*, 56 F.3d 1060, 1069–70 (9th Cir.1995), plaintiffs challenged the issuance of a section 10 permit which was valid only during 1993 and expired on December 31, 1993, and superseded by a new section 10 permit valid for a five-year period. The court held that although the challenged permit was valid for less than one year, the new section 10 permit was valid for five years affording plaintiffs more than adequate time to obtain judicial review. *Id.* at 1070; *see also American Rivers*, 126 F.3d at 1122 (challenge to superseded biological opinion moot and not within "capable of repetition, yet evading review" where effective period for new biological opinion was five years); *Idaho Dep't of Fish and Game v. National Marine Fisheries Service*, 56 F.3d 1071, 1075 (9th Cir.1995).

Here, plaintiffs challenge PALCO's purported irreversible and irretrievable commitment of resources during the section 7(a)(2) consultation process for PALCO's ITP application. The "formal" consultation process began on November 16, 1998, and ended on February 24, 1999, approximately three months later. Any modifications or amendments to the ITP or the HCP or the issuance of new permits, which are clearly contemplated by the Implementation Agreement, would require the reinitiation of consultation and could again subject PALCO to the requirements of section 7(d). However, in contrast to *Greenpeace Action*, the issuance of new permits or modifications to existing provisions of the HCP or ITP are speculative at this time. Also, unlike *Greenpeace Action*, in which the court dealt with the reissuance of the same TAC regulation on an annual basis, the issuance of an ITP for the MMCAs will not occur for five years, allowing plaintiffs ample time to prepare and file a separate action enjoining PALCO from irreversibly committing resources in those areas, and deals with a factual situation entirely distinct from the instant action. Finally, the court notes that the HCP and Implementation Agreement both provide expressly for section 7 consultation and numerous procedural protections to ensure that the requirements of the ESA are complied with prior to modifications to the ITP and HCP. Although PALCO could be subject to the section 7(d) prohibition again, this action is not of a type "capable of repetition, yet evading review." The court therefore dismisses this action as moot.

Finally, in response to the court's order to show cause why this action should not be dismissed as moot, plaintiffs again contend that a sufficient legal dispute exists for the court to grant partial summary judgment on whether the section 7(a)(2) consultation requirements and section 7(d) prohibitions apply to PALCO in this action. For the reasons stated above, the court finds that this action is moot and addresses the questions raised in this order only by way of clarification of the court's March 15, 1999, memorandum and order on plaintiffs' motion for preliminary injunction. PALCO also asks this court to vacate its March 15 order because a live controversy did not exist as of the date the order was issued. In doing so, PALCO asserts that it would be denied the opportunity to challenge the factual and legal decisions of the court on appeal. *Cf. Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir.1997) (quoting *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 24, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994)). It is the "general practice" of the courts of appeals to vacate the judgment of the district courts whenever a case becomes moot, so as to "prevent a judgment unreviewable because of mootness, from spawning any legal consequences." *Id.* (quoting *United States v. Munsingwear*, 340 U.S. 36, 40–41, 71 S.Ct. 104, 95 L.Ed. 36 (1950)). The court, however, finds that the March 15 order properly addressed and adjudicated the issues raised by the parties at the September 3, 1998, hearing. As such, the court finds it appropriate to dissolve the preliminary injunction im-

posed on PALCO but does not vacate the March 15 order.

*CONCLUSION*

For the foregoing reasons, the court hereby orders:

(1) defendants' motion for summary judgment and/or motion to dismiss as moot is GRANTED;

(2) plaintiffs' motion for partial summary judgment is DENIED as moot.

Because this action is dismissed as moot, the court dissolves the injunction prohibiting PALCO and its subsidiaries from conducting or allowing any further logging or other activities within the boundaries of the Timber Harvest Plan Nos. 1–96–413 HUM, 1–96–307 HUM, and 197–286 HUM and from recovering and removing logs already felled and which now lie on the forest floor. This order fully adjudicates the motions reflected at Docket # 99 and # 106, and the Clerk of the Court shall remove them from the pending motions list.

IT IS SO ORDERED.

