TINOQUI–CHALOLA COUNCIL OF KITANEMUK AND YOWLUMNE TEJON INDIANS, Plaintiff,

and

Southwest Center for Biological Diversity; Sierra Club, Plaintiffs–Appellants,

v.

UNITED STATES DEPARTMENT OF ENERGY, Frederico Pena, in his Official Capacity as the Secretary of the Department of Energy; Patricia God-ley, in her Official Capacity as Secretary for Fossil Energy; R. Dobie Langenkamp, in his Official Capacity as Deputy Assistant Secretary for Naval Petroleum and Oil Shale Reserves; Anthony J. Como, in his Official Capacity as Divestiture Administrator for Naval Petroleum Reserve No. 1, Defendants–Appellees,

and

Occidental of Elk Hills, Inc., Defendant–Intervenor–Appellee.

No. 99–16384.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 2, 2000.

Filed Nov. 20, 2000.

Daniel J. Rohlf, Portland, Oregon, for the plaintiffs-appellants.

Greer S. Goldman and Ethan G. Shenkman, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Robert K. Break, Latham & Watkins, Costa Mesa, California, for the defendant-intervenor-appellee.

Before: D.W. NELSON, THOMPSON, and TROTT, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

The Southwest Center for Biological Diversity and the Sierra Club (collectively "Southwest") challenge the legality of the

Department of Energy's ("DOE") sale of Elk Hills to Occidental Petroleum ("Occidental"). Southwest contends the DOE violated section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, by refusing to engage in consultation with the Fish & Wildlife Service ("FWS") prior to completing the sale of Elk Hills and by failing to ensure that the sale would not jeopardize the continued existence of threatened and endangered species. In granting summary judgment in favor of the DOE and Occidental, the district court determined that the completed sale of Elk Hills mooted the controversy. Alternatively, the district court determined that the DOE did not violate section 7 of the ESA.

We have jurisdiction under 28 U.S.C. § 1291 (1994). We conclude that the completion of the Elk Hills sale did not moot the controversy between the parties. We further conclude that Congress waived section 7's consultation requirement as to the DOE's sale of Elk Hills. *See* National Defense Authorization Act of 1996, Pub.L. No. 104–106, 110 Stat. 631 (1997). Accordingly, we affirm the district court's summary judgment by which it concluded that the DOE did not violate section 7 of the ESA.

## FACTS

Elk Hills, which is also referred to as National Petroleum Reserve –1 ("NPR–1") is a tract of approximately 47,000 acres of land located twenty-five miles south of Bakersfield, California. It is known to contain at least four endangered species and one endangered plant, and is the seventh largest oil field in the United States. As far back as 1976, Congress directed the Secretary of Energy to explore and develop Elk Hills at the maximum efficient rate of production.[1] *See* Naval Petroleum Reserves Production Act of 1976, 10 U.S.C. § 7422(c) (1998). Pursuant to that direction and consistent with section 7 of the ESA, the DOE has consulted with the FWS three times since it took over operations at Elk Hills. These consultations have enabled the FWS to evaluate the impact on protected species of the DOE's operation at Elk Hills and to suggest ways to minimize "incidental" takings of these species.

After the most recent consultation, the FWS issued a Biological Opinion letter dated November 8, 1995. The FWS concluded that continuing oil and gas development of Elk Hills at the maximum efficient rate would not likely jeopardize the continued existence of listed species if the DOE agreed to various mitigation measures. The DOE agreed to these measures, and they became part of the incidental take statement issued by the FWS.[2] That statement authorized the DOE to incidentally kill or harm a specified number of listed species and adversely affect a specified amount of habitat. To ensure compliance with the "Terms and Conditions" of the incidental take statement, Section 3(a) provides:

> Prior to the sale of NPR–1, the Department shall initiate and complete a

---

1. The maximum efficient rate is "the maximum sustainable daily oil and gas rate from a reservoir which will permit economic development and depletion of the reservoir without detriment to the ultimate recovery" of the area. 10 U.S.C. § 7420(6) (1998).

2. Under the "Terms and Conditions" section of the incidental take statement, the DOE is required to (1) conduct surveys prior to all surface disturbing activities, (2) provide monitoring during all critical construction activi-

ties within or adjacent to sensitive habitat, (3) minimize the areas affected by construction and day-to-day activities, (4) clean all spills of hazardous materials, (5) impose speed limits within all construction sites, (6) minimize construction activity between dusk and dawn, (7) avoid damaging or destroying San Joaquin kit fox dens, (8) cover all open holes that are more than two feet deep, and (9) release entrapped wildlife.

subsequent section 7 consultation as to this Federal action; and the reasonable and prudent measures and terms and conditions shall be adhered to by the subsequent owner until a section 10(a)(1)(B) permit and CDFG 2081 permit are issued for their actions. In addition, as part of the subsequent section 7 consultation, the Department shall enter into a Conservation Agreement with the Service if the conservation area has not been established.

On February 10, 1996, Congress passed the National Defense Authorization Act of 1996 ("DAA"), which directed the DOE to sell Elk Hills within two years of the statute's effective date. *See* National Defense Authorization Act of 1996, Pub.L. No. 104–106, § 3412(a), 110 Stat. 631, 631–32 (1997). Section 3413(d) of the DAA granted special permission for the DOE to transfer the incidental take statement in place on the statute's effective date if the DOE determined such a transfer was necessary to expedite the sale in a manner that maximized the sale's value to the United States. The transferred statement would "cover the identical activities, and ... be subject to the same terms and conditions, as apply to the permit at the time of the transfer." *Id.* at § 3413(d), 110 Stat. 631, 635.[3]

A few months later, the FWS informed the DOE that both section 7 of the ESA and the incidental take statement required the DOE to reinitiate consultation regarding the proposed sale of Elk Hills. The DOE declined to reinitiate consultation, relying in part on the Department of Interior Regional Solicitor's opinion that the DAA obviated the DOE's consultation obligations relating to the Elk Hills sale.

In October 1997, the DOE accepted a purchase offer from Occidental, which agreed to accept a transfer of the 1995

biological opinion and incidental take statement. Occidental also acknowledged that the incidental take statement's authorization applied only to the extent Occidental acted as contemplated in the biological opinion. The sale of Elk Hills to Occidental closed February 5, 1998.

Prior to the closing of the sale, Southwest and other plaintiffs filed suit against the DOE and sought a preliminary injunction to stop the sale. Occidental intervened. The district court denied the injunction, and this court denied the plaintiffs' request for an emergency stay during the pendency of the appeal. That appeal was later dismissed as moot.

The district court subsequently granted Occidental's motion for summary judgment. The district court held that the completion of the Elk Hills sale mooted the plaintiffs' claims. Alternatively, the district court determined that the DOE had not violated its substantive or procedural duties under section 7 of the ESA. This appeal of the district court's summary judgment followed.

## ANALYSIS

### I

 Occidental contends the completion of the Elk Hills sale rendered the plaintiffs' complaint moot. Mootness, a question of law, is reviewed de novo. *See Alaska Ctr. for the Environment v. United States Forest Serv.,* 189 F.3d 851, 854 (9th Cir.1999). "Generally, an action is mooted when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy." *Id.* The party asserting mootness has the heavy burden of establishing that there is no effective relief remaining for a court to provide. *See GATX/Airlog Co. v. United States Dist. Ct.*

---

**3.** The parties agree section 3413(d)'s reference to an incidental take "permit" rather than an incidental take "statement" is erroneous. "Statement" is the correct term.

*for the Northern Dist. of Cal.,* 192 F.3d 1304, 1306 (9th Cir.1999). Occidental has failed to carry this heavy burden.

■ Generally, the mere conveyance of property to another does not moot a dispute regarding the legality of the conveyance. *See Muckleshoot Indian Tribe v. United States Forest Serv.,* 177 F.3d 800, 815 (9th Cir.1999). In *Muckleshoot,* the Forest Service entered into a land exchange agreement with Weyerhaeuser, a private corporation. Before the agreement was finalized, an Indian tribe filed suit against the Forest Service, asserting claims under various environmental statutes. The district court denied the plaintiff's claims, and the plaintiff failed to seek a stay of the order pending appeal. On appeal, Weyerhaeuser argued the dispute was moot because the land exchange, which involved the transfer of patents and deeds, had been completed; it had obtained a state logging permit; and it had already logged approximately ten percent of the land acquired through the exchange. *See id.* at 814–15. We concluded that the evidence established only that the property transfer had occurred, which was insufficient to establish mootness. *Id.* at 815. We explained "[t]he fact that Weyerhaeuser may have 'destroyed' a portion of the land does not alter the *ability* of the government to accept a reassignment of the property, if required." *Id.* (emphasis added).

■ In this case, Occidental argues the appeal is moot because the status quo cannot be restored. Occidental contends that the DOE lacks the practical means to resume oil and gas operations at Elk Hills if the sale were rescinded because government, contractor and subcontractor personnel have been replaced by Occidental's employees. Many of these employees have been transferred to Elk Hills from facilities outside California. Moreover, in reliance on the sale, Occidental has executed contracts with more than one hundred suppliers and purchasers. Additionally, if the court were to order rescission, the DOE would have to return the $3.5 billion purchase price and reinitiate bidding for a contractor who could resume operations at Elk Hills on behalf of the government. Finally, Kern County, California has amended its General Plan to encompass the use of Elk Hills for private oil and gas production activities. Occidental concludes that rescission of the sale would cause major disruption and turmoil for both Occidental and the DOE.

Occidental relies on *American Horse Protection Ass'n, Inc. v. Watt,* 679 F.2d 150 (9th Cir.1982) and *Dan Caputo Co. v. Russian River County Sanitation Dist.,* 749 F.2d 571 (9th Cir.1984). In *American Horse,* the plaintiffs sought to enjoin an "interim" wild horse roundup that was scheduled to occur prior to the filing of an Environmental Impact Statement. The district court declined to enter either an injunction or a stay pending appeal. While the appeal was pending, the roundup was completed. We determined that the appeal was moot because the roundup was complete and "[w]e cannot order its effects undone." *American Horse Protection Ass'n,* 679 F.2d at 151. In *Dan Caputo Co.,* we concluded that the plaintiff's attempt to enjoin certain construction was moot because the construction had been completed during the pendency of the appeal. *Dan Caputo Co.,* 749 F.2d at 573–74.

Occidental's reliance on *American Horse* and *Dan Caputo Co.* is misplaced. Neither of these cases compel the conclusion that Southwest's request for relief is moot. Unlike the completed construction at issue in *Dan Caputo Co.,* a sale of property can generally be undone. In *American Horse,* the harm was the actual roundup of the wild horses. Once the roundup was completed, simply releasing the horses would not remedy that harm. By contrast, in the present case, the alleged harm to the envi-

ronment and protected species could be ameliorated or avoided through a rescission of the contract.

This court retains broad discretion to fashion equitable remedies. *See Sea–Land Serv. Inc. v. International Longshoremen's & Warehousemen's Union,* 939 F.2d 866, 870 (9th Cir.1991) (explaining that in deciding a mootness issue, the question is not whether the precise relief sought at the time the application for an injunction was filed is still available, but whether there can be "any effective relief"). Under the Administrative Procedure Act ("APA"), we have the authority to order rescission of the sale if we determine that the DOE acted in excess of statutory authority or without observance of the procedures required by law. *See* 5 U.S.C. § 706(2) (1994). Additionally, both parties to the Elk Hills sale are before the court, which obviates concerns about the fairness of rescission to unrepresented parties. *See Burbank Anti–Noise Group v. Goldschmidt,* 623 F.2d 115, 116 (9th Cir.1980) (finding the anti-noise group's challenge to a completed sale was not moot because all parties to the sale were before the court, which would permit a rescission of the sale); *see also Jones v. SEC,* 298 U.S. 1, 17–18, 56 S.Ct. 654, 80 L.Ed. 1015 (1936) ("[A]fter a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided.").

Although Occidental has raised several practical considerations which counsel against rescission, none of these considerations affects the DOE's ability to accept reassignment of Elk Hills. *See National Forest Preservation Group v. Butz,* 485 F.2d 408, 411 (9th Cir.1973) (describing as "nonsense" the defendant's argument that the completion of the sale of national forest land during the pendency of the litigation placed the legality of the sale beyond the court's jurisdiction). The significant, practical difficulties identified by Occidental are more appropriately considered when weighing the equities of any particular remedy. *See National Wildlife Fed'n v. Espy,* 45 F.3d 1337, 1343 (9th Cir.1995) (explaining that when deciding whether to grant injunctive or declaratory relief under the APA, the court must weigh the competing claims of injury and the effect on each party of the granting or withholding of the requested relief). For these reasons, we reject Occidental's contention and the district court's holding that the issues raised by Southwest are moot. We next address the merits of these issues.

## II

■ Southwest argues the DOE, by failing to reinitiate consultation with the FWS prior to the sale of Elk Hills, violated both the procedural and substantive provisions of section 7 of the ESA. The district court rejected this argument and granted summary judgment in favor of the DOE and Occidental. We review de novo a grant of summary judgment. *See Harris v. Harris & Hart, Inc.,* 206 F.3d 838, 841 (9th Cir.2000). An administrative decision involving the ESA will be set aside if the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or if the action is found to be without observance of the procedure required by law. *See Natural Resources Defense Council v. Houston,* 146 F.3d 1118, 1125 (9th Cir.1998), *cert. denied sub nom. Lower Tule River Irrigation Dist. v. Natural Resources Defense Council,* 526 U.S. 1111, 119 S.Ct. 1754, 143 L.Ed.2d 786 (1999).

### A. *Consultation Under Section 7*

■ Federal agencies are required to ensure that any agency action authorized,

funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species. *See* 16 U.S.C. § 1536(a)(2) (1994). Negotiating and executing contracts constitute agency action under the ESA. *See Houston*, 146 F.3d at 1125. An agency action is likely to "jeopardize" a protected species if the action reasonably would be expected to cause an appreciable reduction in the likelihood of the survival and recovery of a protected species by reducing the reproduction, numbers or distribution of that species. *See* 50 C.F.R. § 402.02 (1999).

Before initiating any agency action in areas containing protected species, the agency must (1) independently determine whether its action "may affect" a protected species or its habitat or (2) initiate a formal consultation with the Service having jurisdiction over the species—here, the FWS.[4] *See Houston*, 146 F.3d at 1126. If the agency determines its proposed action "may affect" protected species or habitat, the agency is required to initiate formal consultation. *See id.;* 50 C.F.R. § 402.14(a) (1999). An agency may avoid formal consultation only when it has determined the proposed action is unlikely to adversely affect the protected species or habitat and the FWS concurs with that determination. *See* 50 C.F.R. § 402.14(b) (1999).

After consultation, the FWS issues a biological opinion evaluating the nature and extent of the likely effect on the protected species. If the FWS concludes the proposed action is likely to jeopardize a protected species, it must outline reasonable and prudent alternatives which would avoid jeopardy. *See* 16 U.S.C. § 1536(b)(3)(A) (1994). The FWS then issues an incidental take statement, which specifies the impact of the incidental taking on the species, describes any reasonable measures which are necessary to min-

imize the impact, and sets forth the terms and conditions that must be complied with by the agency to implement those measures. *See id.* at § 1536(b)(4) (1994). Any subsequent taking of the species that is in compliance with these terms and conditions is not prohibited. Although the agency is technically free to disregard the biological opinion, it does so at the risk of incurring civil and criminal penalties, including imprisonment. *See Bennett v. Spear*, 520 U.S. 154, 170, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("The Service itself is, to put it mildly, keenly aware of the virtually determinative effect of its biological opinions."). The ESA's substantive goal of protecting endangered species is served by these explicit procedural requirements. *See Houston*, 146 F.3d at 1125.

### B. *Defense Authorization Act*

■ Southwest argues the DOE violated the procedural provisions of the ESA by failing to consult with the FWS regarding the Elk Hills sale. The DOE responds that the DAA, which permitted the transfer of the DOE's incidental take statement to Occidental, excused the DOE from reinitiating consultation with the FWS.

■ Repeal of legislation by implication is disfavored. *See Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) ("[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."); *Environmental Defense Ctr. v. Babbitt*, 73 F.3d 867, 871 (9th Cir. 1995) (holding that an appropriations rider which temporarily removed the funds available for the Secretary to carry out a statutory duty under the ESA did not repeal this statutory duty, but only restricted the Secretary's ability to comply with the duty). To determine whether

---

**4.** All parties agree the relevant Service is the FWS. Accordingly, for purposes of this opin-

ion, we use the term "the FWS" interchangeably with "the relevant Service."

Congress intended the DAA to repeal or modify the DOE's consultation obligations under the ESA, we focus on the language of the statute. *Id.* To the extent this language is ambiguous, we consider the relevant legislative history. *Id.*

The DAA requires the Secretary of Energy ("Secretary") to enter into a contract for the sale of Elk Hills within two years of the statute's effective date. *See* National Defense Authorization Act of 1996, Pub.L. No. 104–106, § 3412(a), 110 Stat. 631 (1997). To accomplish this directive, the Secretary is required to publish, within two months of the effective date, a notice of intent to sell Elk Hills. *See id.* at § 3412(c), 110 Stat. 631, 632. Within seven months of the effective date, the Secretary and the Director of the Office of Management and Budget ("OMB") must establish a minimum sale price. *See id.* at § 3412(d), 110 Stat. 631, 632. Within eleven months of the effective date, the investment banker or financial advisor retained by the Secretary must have completed a draft contract, which will accompany the solicitation of offers. *See id.* at § 3412(e)(2), 110 Stat. 631, 633. The Secretary, through consultation with the Director of the OMB, is required to provide written notification to the appropriate congressional committee of any noncompliance with the statutory deadlines along with a plan to ensure that the sale is completed within the two-year period. *See id.* at § 3412(i), 110 Stat. 631, 634.

Section 3413(d) of the DAA, titled "Transfer of Otherwise Nontransferable Permit," provides:

> The Secretary may transfer to the purchaser or purchasers (as the case may be) of Naval Petroleum Reserve Numbered 1 the incidental take permit regarding the reserve issued to the Secretary by the United States Fish and Wildlife Service and in effect on the effective date if the Secretary deter-mines that transfer of the permit is necessary to expedite the sale of the reserve in a manner that maximizes the value of the sale to the United States. The transferred permit shall cover the identical activities, and shall be subject to the same terms and conditions, as apply to the permit at the time of the transfer.

*Id.* at § 3413(d), 110 Stat. 631, 365.

The DAA also requires that before entering into a contract to sell Elk Hills, the Secretary must give written notification to the appropriate congressional committee describing the conditions of the proposed sale and the Secretary's assessment of whether the sale is within the best interests of the United States. *See id.* at § 3414(a), 110 Stat. 631, 365. After giving such notice, the Secretary must wait thirty-one days before executing the sale contract. *See id.* Additionally, if the Secretary and the Director of the OMB jointly determine the sale is proceeding in a manner inconsistent with the best interests of the United States, they are authorized to suspend the sale. *See id.* at § 3414(b), 110 Stat. 631, 635. After giving notification to the appropriate congressional committee of any suspension, the Secretary may not complete the sale without subsequent authorization from Congress. *See id.* at § 3414(c), 110 Stat. 631, 635.

The DOE and Occidental argue that Congress, by passing the DAA, waived the section 7 consultation requirements as to the Elk Hills sale. The DOE relies on *Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441 (9th Cir.1992), in which this court considered the Arizona–Idaho Conservation Act's effect on the ESA regarding the construction of seven telescopes on Mount Graham in southeastern Arizona. Section 602(a) of that Act states:

> Subject to the terms and conditions of Reasonable and Prudent Alternative Three of the Biological Opinion, the re-

quirements of section 7 of the Endangered Species Act shall be deemed satisfied as to the issuance of a Special Use Authorization for the first three telescopes and the Secretary shall immediately approve the construction of the following items:

(1) three telescopes to be located on Emerald Peak

(2) necessary support facilities; and

(3) an access road to the Site.

Arizona–Idaho Conservation Act of 1988, Pub.L. No. 100–696, § 602(a), 102 Stat. 4571, 4597 (1989).

The Arizona–Idaho Conservation Act also provides, in section 603, that four additional telescopes shall be constructed after consultation, as required by section 7, including the biological data obtained from monitoring the impact of the construction of the three initial telescopes. *See id.* at § 603, 102 Stat. 4571, 4597–98. In *Mt. Graham Red Squirrel*, after considering the language of the Arizona–Idaho Conservation Act and the limited legislative history, we determined Congress intended to waive section 7's consultation requirement as to the construction of the first three telescopes. *Mt. Graham Red Squirrel*, 954 F.2d at 1457.

Unlike the Arizona–Idaho Conservation Act, the DAA does not explicitly mention section 7 of the ESA. However, the DAA permits the transfer, at the Secretary's discretion, of the incidental take statement in effect on the DAA's effective date. Because the incidental take statement is generally nontransferable, this provision reflects Congress's intent to permit the purchaser to continue operations under the same terms and conditions applicable to the DOE without requiring the DOE to reinitiate consultation with the FWS and without requiring the purchaser to first obtain a permit pursuant to section 10 of the ESA. *See* 16 U.S.C. § 1539 (1994).

The legislative history of the DAA is also instructive. It states:

The conference agreement provides for the transfer of a current environmental permit (50 C.F.R. 13.25) in order to allow the purchaser to continue the operation of the field with all the environmental safeguards provided by the federal government. In addition, the conferees expect that this will ensure that the value of the field will not be diminished by the uncertain timing of obtaining a new permit.

H. REP. No. 104–450, at 964 (1996), *reprinted in* 1996 U.S.C.C.A.N. 449. This legislative history reflects Congress's intention to permit the purchaser to step into the shoes of the DOE and continue operating Elk Hills under the 1995 Biological Opinion without additional consultation with the FWS. Moreover, to require the DOE to reinitiate consultation with the FWS prior to the Elk Hills sale would likely conflict with Congress's directive to complete the sale within two years. Consultation can be extremely lengthy and time-consuming. The DOE asserts, and Southwest does not dispute, that the consultation resulting in the 1995 biological opinion took four years to complete.

We also note that the Department of the Interior Regional Solicitor ("Solicitor"), after considering the effect of § 3413(d) of the DAA on condition 3(a) of the incidental take statement, also determined that the DOE was not required to reinitiate consultation prior to the Elk Hills sale. The Solicitor concluded that the provision permitting the Secretary to transfer to the purchaser the incidental take statement in effect on the DAA's effective date had the effect of nullifying condition 3(a). The Solicitor explained that a new incidental take statement issued after reconsultation would "serve no purpose" because "the new incidental take statement would apply neither to the DOE, which would no longer own or operate [Elk Hills], nor to the

purchaser(s), whose activities would be governed by the [1995] biological opinion and incidental take statement." The Solicitor further concluded that "[t]he purposes of the Conservation Agreement (as the term is used in term and condition 3(a)) are served by the contract(s) and/or purchase agreement(s) that will be executed by [the] DOE and the purchaser(s) since the contract(s) and/or purchase agreement(s) will obligate the purchaser(s) to fulfill the requirements contained in the biological opinion that have not been completed by [the] DOE...." The Solicitor emphasized that the transferred incidental take statement would remain in effect only if the purchaser's activities in Elk Hills were identical to those evaluated in the 1995 biological opinion. Endangered species in Elk Hills would be protected, because any changes in operations, such as altering the rates of production, construction or expansion of facilities, would require the purchaser to seek a section 10(a)(1)(B) permit prior to instituting the new activity.

We are persuaded by the Solicitor's reasoning. Although the DAA is not as explicit as the legislation at issue in *Mt. Graham Red Squirrel*, it appears from both the text of the DAA and its legislative history that Congress intended to permit the DOE to sell Elk Hills without reinitiating consultation with the FWS. Congress concluded that the joint goals of maximizing the sale price of the property and effectuating the purpose of the ESA would be accomplished by transferring the 1995 biological opinion and requiring the purchaser to comply with the terms and conditions of the incidental take statement. Moreover, we are convinced the DOE has fulfilled its substantive obligations under section 7 because Occidental's activities in Elk Hills must remain identical to those evaluated in the 1995 biological opinion or Occidental must obtain a section 10 incidental take permit prior to changing its activities.

## CONCLUSION

The completion of the Elk Hills sale to Occidental did not moot the controversy between the parties. Nevertheless, we hold that the district court correctly concluded that the DOE· did not violate section 7 of the ESA. By passing the DAA, Congress waived the DOE's duty to reinitiate consultation under section 7 as to the Elk Hills sale. Accordingly, the district court's grant of summary judgment in favor of the DOE and Occidental is AFFIRMED.